**2024 UT App 182**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
HUMBERTO MAYORGA,
Appellant.

Opinion
No. 20230464-CA
Filed December 12, 2024

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 211905581

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Marian Decker,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1 A jury convicted Humberto Mayorga of three crimes: unlawful possession of a firearm, aggravated assault with said firearm, and criminal mischief. The events in question involved interactions between Mayorga and his then girlfriend, Elise.[1] Mayorga appeals his convictions, asserting primarily that Elise's testimony was inherently improbable and therefore could not have constituted sufficient evidence to convict him. Mayorga also brings plain error and ineffective assistance claims concerning the lack of a jury instruction regarding specific jury unanimity on the

---

1. A pseudonym.

aggravated assault charge. We reject all of Mayorga's arguments and therefore affirm his convictions.

BACKGROUND[2]

¶2      In the summer of 2020, Mayorga met Elise, and they soon began dating. On occasion, the couple would use drugs together—Mayorga would use heroin and methamphetamine, and he would sometimes obtain cannabis and alcohol for Elise.

¶3      After a few months, their relationship hit a rough patch and, on December 15, 2020, Elise rented a room at a local hotel so the pair could spend some time together. On the way to the hotel, they stopped and obtained some drugs for Mayorga. At one point after arriving at the hotel, Elise saw Mayorga texting someone on his phone, and she asked who it was. Mayorga responded that it was none of her business and threatened to leave the hotel. Elise took a conciliatory tack; she apologized for questioning Mayorga and placed her head on Mayorga's chest, and he responded by putting "his arm around . . . [her] neck" and placing her in a chokehold, applying enough pressure that she could not breathe. Mayorga then dragged her across the room—a distance of about seven or eight feet—and dropped her at the foot of the bed. Elise began to cry and, feeling unwell, decided to take a shower. Afterward, she heard her phone ringing. Mayorga answered the phone and began talking to the caller, a man Elise knew. Mayorga threatened the caller, stating that he wanted to "meet up." While still on the phone, Mayorga told Elise to come with him, and they

_____

2. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (quotation simplified). In this case, we recite the facts from Elise's perspective, even though (as discussed below) the jury did not convict Mayorga on all charges.

got in the car. He then began to drive, asking the caller where he was and inviting him to meet them somewhere. Ultimately, though, Mayorga was unable to arrange a meeting, and after a while, Elise prevailed upon him to return to the hotel.

¶4 Back at the hotel, Mayorga asked Elise why she was talking to other men and "making him look bad." At some point after their return, Mayorga took out a handgun—a black one that Elise had previously bought for him at his instruction and using his money—and he pointed it at Elise and told her that he was going to shoot her. Elise testified that Mayorga loaded the gun and, at various points throughout the remainder of the evening, pointed the gun at her. Mayorga apparently did this in multiple locations in the hotel room: while Elise was on the bed, when Elise went to get her phone from where Mayorga had placed it next to the TV, and when Elise attempted to leave the hotel room. On that last occasion, Mayorga refused to let her leave and hit her in the chest with the nose of the gun while blocking the door, an event that Elise claimed resulted in a rounded bruise. She tried taking pictures of this bruise, but she testified that she deleted them because the bruise did not show up well in the photos.

¶5 Elise also testified that, at one point during the same evening, Mayorga grabbed a steak knife from the hotel room's kitchenette and placed it against her neck, telling her "that knives are a lot quieter than guns." Although Elise could feel the pressure of the knife against her neck, she was not cut or injured. When she tried to hide the knife under a pillow later in the evening, Mayorga again threatened her with the gun, loading it, pushing the slide back, and putting it in her face. Elise estimated that, throughout the course of the evening, Mayorga pointed the gun at her more than five times and placed the knife to her neck "[a] couple" times.

¶6     The hotel room incident eventually ended after Mayorga smoked some heroin, calmed down, and fell asleep. The next morning, Elise dropped Mayorga off at his house.

¶7     About a month later, on January 13, 2021, Elise gave Mayorga a ride to work. During the drive, the two of them had an animated discussion in which Elise accused Mayorga of "narcissism" and "gaslighting." In response to Elise's comments, Mayorga punched her car radio, breaking the screen.

¶8     In another incident that occurred three days later, on January 16, Elise was again riding in a car with Mayorga and—as she described it—she went to playfully hit Mayorga on the shoulder but instead "accidentally" hit him in the face. In response, Mayorga "backhanded" Elise in the mouth, causing a bruise and bleeding underneath her lip.

¶9     The final incident relevant to this appeal occurred on February 3, 2021. After work, Elise went to visit Mayorga—at his invitation—at his new apartment. Elise was excited to see Mayorga as she thought things were getting better between them, and when she arrived, she let herself into the apartment, as she claimed Mayorga had instructed her to do. After kissing Mayorga and preparing to lie beside him in bed, another woman entered the room, surprising Elise. The woman's sudden appearance upset Elise, and she testified that she threw a bottle in Mayorga's direction, scratching his elbow, and kicked the woman's coat.

¶10    Mayorga escorted Elise outside, and after exiting the apartment, Elise called the police because she "wanted them to know all the things that he had done to [her]." She told the operator that Mayorga had hit her, but then she hung up the phone. The operator called Elise back, and she met with officers later that night. She explained that she had caught Mayorga cheating on her and discussed the events of February 3, but during this interview she did not mention the earlier hotel room incident. According to Elise, the responding officer was rude,

would not listen, and talked over her. After meeting with Elise, officers came to believe that Elise was the aggressor during the February 3 incident, and she was later charged with two counts of aggravated assault related to the events of that evening.

¶11    The next day, after learning that she had been charged, Elise went to the police station—accompanied by her grandfather—to report Mayorga's previous actions. She felt that her "assault charges weren't fair," and she "wanted people to know what [Mayorga] had done to [her]." Elise met with another officer (Officer) and filled out a written statement, describing the December 15 incident at the hotel room. In that statement, Elise did not mention anything about Mayorga choking her. Officer then created an initial report, marking the case for follow-up. After this meeting, Elise returned home, met with her criminal defense attorney, and prepared a second written statement. This second statement did include an account of Mayorga placing her in a chokehold in the hotel room.

¶12    Six days later, Elise returned to the police station with her attorney and provided her second statement to a detective (Detective). During an ensuing meeting with Detective, Elise told him that Mayorga strangled her *after* they had returned from looking for the man who had called Elise (rather than before, as she eventually testified at trial). At one point during this meeting, Elise became flustered and confused regarding the order of events, and she asked Detective to refer to her second statement.

¶13    After completing its investigation, the State charged Mayorga with nine crimes: (1) aggravated kidnapping, a first-degree felony (later amended to a third-degree felony); (2) aggravated assault, a second-degree felony; (3) possession of a firearm by a restricted person, a second-degree felony; (4) possession of a dangerous weapon by a restricted person, a third-degree felony; (5) and (6) two counts of aggravated assault (domestic violence), third-degree felonies; (7) and (8) two counts

of criminal mischief, class A misdemeanors; and (9) assault (domestic violence), a class A misdemeanor.[3] The first six counts related to the December 15 incident at the hotel room. The seventh count—for criminal mischief—related to the January 13 incident with the car radio. And the last two counts related to the January 16 incident in the car.

¶14 On February 20, 2021—after charges were brought against Elise but before charges were brought against Mayorga—Elise spoke with Mayorga on a recorded line. During that conversation, Elise said she would "try to make things easy for" Mayorga. Referring to potential charges against Mayorga, Elise said, "Whatever happens, I'll do anything in my power to make it less harsh." Elise also asked Mayorga "to make things easy on [her] as well." Her idea was to have the charges dropped against Mayorga in exchange for him dropping the assault charges against her. Later, Elise expressed surprise that this conversation might expose her to liability for witness tampering, and the State, prior to Mayorga's trial, granted Elise immunity from any such charges in exchange for her testimony against Mayorga.[4]

¶15 The State's case against Mayorga proceeded to a jury trial, and the State called Elise, Officer, and Detective as witnesses, who each testified as to the events described above. The State also called a forensic nurse, who offered testimony about the anatomy of strangulation and the dynamics of domestic abuse.

---

3. The State's information included ten charges, but one count—aggravated assault related to an incident alleged to have occurred on December 28, 2020—was later dismissed for lack of evidence.

4. While the State granted Elise immunity from potential witness tampering charges, it proceeded with the pending charges against her related to the February 3 incident, and Elise eventually pled guilty in abeyance to a single misdemeanor charge.

¶16  Mayorga elected not to testify, but he did call two other witnesses: his sister and his nephew, who testified about scratches they believed Elise had administered to Mayorga and about text messages between Elise and Mayorga's sister.

¶17  At the conclusion of evidence, Mayorga's attorney (Counsel) made a motion for a directed verdict. His argument, in its entirety, was as follows:

> I hate making these. I'll be very brief, Your Honor. We understand the motion for directed verdict standard. We understand that the witness testified what appears to be elements of each of the offenses. We just challenge whether . . . it was sufficient that a reasonable jury could find proof beyond a reasonable doubt, and we would submit.

After hearing from the State, the trial court denied the motion, ruling that "the State [had] presented a prima facie case" on all the charges and that there was "believable evidence on each count as charged in the information."

¶18  The court then instructed the jury, and it gave several instructions generally indicating that the verdict needed to be unanimous. One of these—Instruction 50—stated that "[b]ecause this is a criminal case, every single juror must agree with the verdict before the defendant can be found 'guilty' or 'not guilty.'" But Counsel did not ask for, and the court did not give, an instruction specifically stating that the jury needed to reach unanimous agreement as to which act goes with which charge.

¶19  The attorneys then made their closing arguments. During its argument, the State gave the jury its perspective about which count went with which factual events. The State indicated that the first count—for aggravated kidnapping—was for when Mayorga "detained [Elise] against her will" in the hotel room on December 15. It argued that the second count—for aggravated assault

including loss of consciousness—was for when Mayorga "impeded the breathing" of Elise in the hotel room on December 15. It asserted that "[c]harge number three" (Count 3) for "possession of a dangerous weapon" was for possessing the gun that Elise said Mayorga had brandished on December 15 at the hotel. It specified that the other charge of "[p]ossession of a dangerous weapon" was for possession of the "knife" that Elise said Mayorga had taken from the hotel room's kitchenette and held to her throat. It indicated that the next charge of aggravated assault (Count 5) was for when Mayorga "pointed" the gun at Elise, "racked it," and "hit her with it" in the hotel room. And the following charge of aggravated assault (Count 6), the State said, was for when he held the knife at Elise's throat in the hotel room. The State asserted that the criminal mischief count (Count 7) was for when Mayorga broke Elise's car radio on January 13. And the final two charges were related to the incident on January 16.

¶20 After closing arguments, the jury retired to the jury room. About fifteen minutes into its deliberations, the jury sent a written question to the court, asking, "What happens if we can't reach a unanimous decision?" In response, the court stated, "Please refer to Jury Instruction 50, [d]iscuss the evidence, and continue your deliberations." Later, the jury asked whether Elise was the alleged victim of both Count 5 and Count 6. The court confirmed that Elise was the alleged victim of all the counts in the information. The jury also asked, "What is the difference between Count 5 and Count 6? Is one for using a gun and one for using a knife?" The court answered in the affirmative.

¶21 After several hours of deliberation, the jury returned a split verdict. It found Mayorga guilty on Count 3 (possession of the gun), Count 5 (assault with the gun in the hotel room), and Count 7 (criminal mischief with the car radio). But the jury acquitted Mayorga on all other charges, including aggravated kidnapping, aggravated assault with loss of consciousness, possession of the

knife, aggravated assault with the knife, and both charges stemming from the January 16 incident.

¶22 A few weeks after the verdict, but prior to sentencing, Mayorga filed a motion to arrest judgment on the two felony counts (Count 3 and Count 5). In that motion, Mayorga asserted that "the evidence presented at trial . . . renders the jury's . . . verdicts" on those counts "so inconclusive or so inherently improbable that reasonable minds must have entertained a reasonable doubt" about Mayorga's guilt. He pointed out that the jury had acquitted him on the other counts, a fact he asserted meant that "the jury had to [have found Elise's] claims as fabricated for the other counts." And he asserted that the verdict must have been "the result of a compromise." At oral argument on the motion, Counsel argued that "it appears that the verdict in this case was the result of a compromise," and he asserted that "the jury clearly did not believe" Elise on "the most serious counts." The trial court denied the motion.

¶23 Later, the trial court sentenced Mayorga to prison on the three convictions, with the sentences to run concurrently to each other and consecutively to a prison sentence Mayorga was then serving in a different matter.

ISSUES AND STANDARDS OF REVIEW

¶24 Mayorga now appeals his convictions, and he presents two issues for our consideration. First, he challenges the trial court's denial of his motions for directed verdict and to arrest judgment, asserting that the evidence was insufficient to support the convictions. As part of this challenge, Mayorga contends—for the first time on appeal—that Elise's trial testimony was "inherently improbable" under *State v. Robbins*, 2009 UT 23, 210 P.3d 288, and therefore should not have been considered in the sufficiency-of-the-evidence analysis. Had the *Robbins* part of the claim been raised in the trial court, we would have reviewed the court's

ruling on that point deferentially. *See State v. Skinner*, 2020 UT App 3, ¶ 20, 457 P.3d 421 (stating that we "review deferentially a trial court's decision to decline to disregard a witness's testimony due to inherent improbability, reversing the trial court's decision only if it was clearly erroneous" (quotation simplified)). But as we explain below, Mayorga did not make a *Robbins* argument in the trial court, and he does not ask us to assess that argument under any of our exceptions to the preservation requirement. Thus, we address on the merits only Mayorga's general insufficiency challenge, and on that score we review the trial court's ruling for correctness. *See State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251 ("We review a [trial] court's grant or denial of a motion for directed verdict and to arrest judgment for correctness.").

¶25 Second, Mayorga points to the absence of any specific jury unanimity instruction as to Count 5, and he asserts that the trial court plainly erred and that Counsel rendered ineffective assistance in not providing or requesting such an instruction. "Claims for plain error and ineffective assistance of counsel present questions of law, which we evaluate for correctness." *State v. Samora*, 2022 UT App 7, ¶ 16, 504 P.3d 195.

ANALYSIS

I. Sufficiency of the Evidence

¶26 Mayorga's first argument is that the evidence the State presented at trial was insufficient to support the three convictions. And in connection with this argument, Mayorga contends—citing *Robbins*—that Elise's testimony was "so inherently improbable that no reasonable juror could have believed it beyond a reasonable doubt" and that this testimony therefore cannot be considered in any sufficiency-of-the-evidence analysis.

¶27 "In situations like this one, our analysis has two parts." *State v. Barnes*, 2023 UT App 148, ¶ 19, 542 P.3d 108, *cert. denied*,

544 P.3d 459 (Utah 2024). First, we must analyze the evidence that the movant claims is inherently improbable, and we must "determine[] whether the challenged piece of evidence is of such a poor quality that it should be disregarded." *See State v. Jok*, 2021 UT 35, ¶ 30, 493 P.3d 665. Our determination of this question will dictate the "dimensions of the universe of evidence" that may be considered in the ensuing sufficiency-of-the-evidence analysis. *See Barnes*, 2023 UT App 148, ¶ 21 (stating that, "[g]iven the relationship between" the two parts of the argument, we should examine the "inherent improbability claim first, then address [the] sufficiency claim only after we know the dimensions of the universe of evidence we are allowed to consider").

¶28 Second, we undertake our sufficiency analysis, considering all evidence that has not been excluded from consideration on grounds of inherent improbability. For instance, if we determine that the challenged testimony is inherently improbable, we "then determine if sufficient evidence remains under which a reasonable jury could have convicted." *See Jok*, 2021 UT 35, ¶ 30; *see also Skinner*, 2020 UT App 3, ¶ 26 ("[A] defendant who raises [an inherent-improbability] claim . . . is asking the court, in conducting its sufficiency-of-the-evidence review, to examine only a particular subset of the admitted evidence, and to disregard certain witness testimony before undertaking that review."). "On the other hand, if we determine that the challenged evidence is not inherently improbable, our sufficiency-of-the-evidence analysis will include the challenged evidence." *Barnes*, 2023 UT App 148, ¶ 20. In that situation, we will consider "all admitted evidence to determine if some evidence exists that could support the verdict," since "it is ordinarily not the court's place to disregard any particular items of admitted evidence." *Skinner*, 2020 UT App 3, ¶ 25 (quotation simplified).

¶29 A *Robbins* inherent-improbability claim is subject to a separate preservation requirement. We have stated that a *Robbins* claim "may be a component of an insufficiency challenge, but not

every insufficiency challenge raises a *Robbins* issue." *State v. Doyle*, 2018 UT App 239, ¶ 19, 437 P.3d 1266. A *Robbins* challenge necessarily "introduces a new legal theory" distinct from general insufficiency: "that the insufficiency should be reviewed only *after* [certain] testimony is ignored as 'inherently improbable.'" *Id.*; *see also Stricklan*, 2020 UT 65, ¶ 125 (stating that "the *Robbins* issue . . . concerns a distinct legal theory" from general insufficiency). To preserve any issue for appellate review, "the issue must be *specifically* raised such that the issue was sufficiently raised to a level of consciousness before the trial court." *State v. Marquina*, 2018 UT App 219, ¶ 42, 437 P.3d 628 (quotation simplified), *aff'd*, 2020 UT 66, 478 P.3d 37. Applying those principles in this particular context, we have stated that a "defendant who wants a trial court to disregard a witness's testimony under *Robbins* before, or in connection with, undertaking a sufficiency-of-the-evidence review must make that request known to the trial court so that the court has an opportunity to rule on the issue." *Skinner*, 2020 UT App 3, ¶ 29.

¶30   In this case, Mayorga certainly preserved a general insufficiency argument for appellate review; indeed, he made both a motion for directed verdict at the close of the State's case-in-chief as well as a later motion to arrest judgment. In both of those motions, Mayorga argued that the State's evidence was insufficient to convict him. But in neither of those motions did Mayorga raise a *Robbins* claim with regard to Elise's testimony: at no point did he assert that her testimony should be disregarded in an insufficiency analysis due to inherent improbability, and at no point did he cite *Robbins* or any subsequent similar case law.

¶31   In an effort to resist the conclusion that his *Robbins* claim is unpreserved, Mayorga points to two facts: that in his motion to arrest judgment he used the phrase "inherently improbable," and that the trial court, in denying his initial motion for directed verdict, stated that there was "believable evidence" to support the State's case. From these facts, he argues that "[t]he context of [his]

case made clear that the issue in dispute was [Elise's] credibility." We see the matter differently.

¶32 Mayorga's motion to arrest judgment did use the phrase "inherently improbable." But in that motion, Mayorga did not assert that Elise's testimony was inherently improbable; instead, he asserted that the "verdicts" were inherently improbable. As we understand the argument, Mayorga asserted that the verdict must have been "the result of a compromise" because the jury had to have disbelieved Elise, at least in part, in order to acquit him on the other charges. In his view, the guilty verdicts were therefore "inherently improbable" because "the jury had to find [Elise's] claims as fabricated for" the acquittal counts "yet somehow believable beyond a reasonable doubt as to" the conviction counts. This is a much different argument from asking the court to disregard Elise's entire testimony as inherently improbable, and in our view Mayorga did not do enough, in his post-trial motion, to bring a *Robbins* request to the court's consciousness.

¶33 Likewise, the court's statement, made in the context of denying Mayorga's very brief directed verdict motion—that the State had presented sufficient "believable evidence" to support the charges—was not, in context, a *Robbins* ruling regarding Elise's testimony. Mayorga's oral motion made no mention of either *Robbins* or of Elise's testimony specifically, and in context the trial court's statement was simply intended to convey that, in its view, sufficient competent evidence had been presented to support the charges. Mayorga's motion simply did not do enough to raise a *Robbins* issue to the court's consciousness.

¶34 Thus, we conclude that Mayorga's *Robbins* argument is being made for the first time here on appeal and is therefore unpreserved for appellate review. And in his briefing on this issue, Mayorga does not ask us to apply any of our established exceptions to our preservation rule, such as plain error or ineffective assistance of counsel. Accordingly, we do not reach the

merits of Mayorga's *Robbins* claim. *See State v. Johnson*, 2017 UT 76, ¶ 18, 416 P.3d 443 ("A failure to preserve an issue in the trial court generally precludes a party from arguing that issue in an appellate court, absent a valid exception.").

¶35 As to Mayorga's general insufficiency challenge—which *is* preserved for appellate review—we conclude that the State presented sufficient evidence to support convictions on Counts 3, 5, and 7.[5] Because Mayorga's *Robbins* claim was unpreserved and we do not reach its merits, Elise's testimony is considered proper evidence for purposes of our sufficiency analysis. That is, the "universe of evidence" to be considered in our analysis includes Elise's testimony as well as all other evidence presented at trial. *See Barnes*, 2023 UT App 148, ¶ 21.

¶36 And with that universe of evidence in mind, there is clearly enough evidence to support Mayorga's convictions. We will uphold a trial court's denial of sufficiency challenges "if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements

---

5. The State argues that Mayorga affirmatively waived any challenge to the sufficiency of the evidence regarding Count 7, the conviction for criminal mischief having to do with the car radio. In the State's view, Mayorga waived this argument when he chose not to include it in his motion to arrest judgment and when he acknowledged, during oral argument on that motion, that he hadn't included it because "there was some potential evidentiary support" for that conviction. There is certainly strength to the State's argument, but because we agree that there was indeed sufficient evidence to support conviction on that count, we choose to simply dispose of this claim on its merits rather than resorting to principles of waiver. *Cf. State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation.").

of the crime had been proven beyond a reasonable doubt." *State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 (quotation simplified). In this case, there exists at least some evidence, when viewed in a light favorable to the State, to support all three convictions.

¶37 With regard to the firearm possession charge, Elise testified that Mayorga had a handgun while they were in the hotel. This testimony alone is sufficient to provide a basis for conviction on Count 3. *See* Utah Code § 76-10-503(2)(a) (2021). With regard to the charge for aggravated assault with the gun, Elise testified that Mayorga pointed the gun at her multiple times and threatened to shoot her with it. This testimony constitutes sufficient evidence to support a conviction on Count 5. *See id.* § 76-5-103(1). And with regard to the criminal mischief charge, Elise testified—supported by a photograph—that Mayorga intentionally punched her car radio and broke the screen. This evidence is sufficient to support a conviction on Count 7. *See id.* § 76-6-106(2)(b)(i)(B).

¶38 Accordingly, we reject Mayorga's appellate challenges regarding the sufficiency of the evidence, and we affirm the trial court's denial of Mayorga's directed verdict motion and his post-trial motion to arrest judgment.

## II. Unanimity Instruction Regarding Count 5

¶39 Mayorga's second argument is that there should have been a separate jury instruction regarding specific unanimity on Count 5, the charge for aggravated assault involving the gun. During her testimony, Elise described at least five instances in which she said Mayorga pointed the gun at her during the course of the evening in the hotel room. *Supra* ¶¶ 4–5. Yet Mayorga was charged with only one count (rather than five) of aggravated assault with the gun, and Mayorga asserts that jurors should have been instructed that they needed to reach unanimous agreement as to which specific act constituted the crime for which they convicted him. But Mayorga did not request any such instruction at trial, and he therefore recognizes that he did not preserve any complaint about

its absence for our review here on appeal. Instead, he asks us to review this issue for plain error and ineffective assistance of counsel. But both plain error and ineffective assistance are doctrines that require a showing of prejudice, and on this record, we conclude that Mayorga has not demonstrated the requisite prejudice. On that basis, we reject Mayorga's arguments.

¶40   To succeed on a claim of ineffective assistance of counsel, Mayorga "must demonstrate both (1) 'that counsel's performance was deficient' and (2) 'that the deficient performance prejudiced the defense' so as to 'deprive the defendant of a fair trial.'" *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Mayorga must make a successful showing on both elements; indeed, if "either is lacking, the claim fails and the court need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031. And to succeed on a claim of plain error, Mayorga "must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Popp*, 2019 UT App 173, ¶ 35, 453 P.3d 657 (quotation simplified). "The prejudice analysis is the same for claims of plain error and ineffective assistance of counsel." *State v. Norton*, 2021 UT 2, ¶ 101, 481 P.3d 445. Because we conclude that—even if error or deficient performance is presumed to be present—Mayorga was not prejudiced, we limit our discussion to the prejudice element common to both tests.

¶41   To demonstrate prejudice in this context, Mayorga must convince us that "there is a reasonable probability that, but for the error, the outcome would have been different." *State v. McNeil*, 2016 UT 3, ¶ 30, 365 P.3d 699 (quotation simplified).[6] If Mayorga

---

6. Recently, our supreme court indicated that the failure to give a specific unanimity instruction, when one is required, is a "constitutional error" that—when the issue is raised in the trial court and preserved for appellate review—carries "a presumption

(continued…)

cannot make that showing, then both of his claims—for plain error and for ineffective assistance—fail. *See id.* ¶ 25 ("Because both claims require a showing of prejudice, if we conclude that the errors . . . were not prejudicial," then the "claims of ineffective assistance of counsel and plain error fail.").

¶42 For purposes of our analysis, we assume that a jury instruction regarding specific unanimity for Count 5 should have been given. After all, "[p]rejudice analysis is counterfactual," and so we must envision, for purposes of our analysis, "an alternative universe in which the trial went off without the error," and then assess whether the hypothetical trial is "reasonably likely to have turned out differently" from the actual trial. *See State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86; *see also State v. Mottaghian*, 2022 UT App 8, ¶ 59, 504 P.3d 773 (stating that we must assess whether "there

---

of prejudice that may be rebutted if the State proves that the error was harmless beyond a reasonable doubt." *State v. Chadwick*, 2024 UT 34, ¶¶ 48, 53, 57, 554 P.3d 1098. The situation is different, however, when the issue is not raised in the trial court and therefore not preserved for appellate review, and we are therefore asked to analyze prejudice through the lens of plain error or ineffective assistance: in those situations, the defendant still bears the burden of demonstrating prejudice, even when the unpreserved claim involves an issue of constitutional dimension. *See State v. Baugh*, 2024 UT 33, ¶ 42, 556 P.3d 35 (analyzing a claim of ineffective assistance for failing to request a specific jury unanimity instruction, and stating that "the defendant must show" prejudice by demonstrating that "counsel's errors actually had an adverse effect on the defense, and that there is a reasonable probability that, but for those errors, the result of the proceeding would have been different" (quotation simplified)); *see also State v. Leech*, 2020 UT App 116, ¶ 43 n.7, 473 P.3d 218 (stating that the State bears the burden of persuasion regarding prejudice only in cases involving preserved claims "of constitutional dimension").

existed a reasonable probability of a different outcome had the jury been provided a specific unanimity instruction").

¶43 Elise testified that Mayorga threatened her with the gun at least five times during the course of the evening at the hotel room. But the State only charged Mayorga with one count of aggravated assault (Count 5) related to those acts. Mayorga asserts that, under these circumstances, some of the jurors might have believed Elise's testimony with regard to one of the five or so assaults, while others might have believed her testimony with regard to a different assaultive act. And he posits that it is therefore possible that jurors didn't ever achieve unanimity as to which act formed the basis for the conviction. *See State v. Hummel*, 2017 UT 19, ¶ 28, 393 P.3d 314 (stating that "jury unanimity means unanimity as to a specific crime," and that "a verdict would not be valid if some jurors found a defendant guilty of robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though all jurors found him guilty of the elements of the crime of robbery" (quotation simplified)).

¶44 The State counters by arguing that, on this record, "there was no rational basis in the evidence for the jury to conclude that only *some* of the assaults occurred and that others did not," because on these specific facts, "[t]he jury was either going to conclude that all of the assaults occurred or that none of them did." The State points out that the jury convicted Mayorga on Count 3 (possession of the gun), indicating that the jury believed Elise's testimony that Mayorga had the gun in the hotel room during the incident. Reasoning from this fact, the State asserts that "there is no reasonable likelihood that the same jury that unanimously agreed [that Mayorga] possessed a gun *and* committed *some* act of aggravated assault with it at the hotel would not have agreed on a *specific* threatening act, based on the evidence, had it been instructed to do so." We find the State's reasoning persuasive.

¶45    Important to our analysis is the reality that all five (or so) of the assaults Elise described occurred on the same evening, in the same hotel room, with the same gun, involving the same two people, and as part of the same continuous course of conduct. Indeed, most of the acts Elise described are relatively generic actions that were discussed together and for which she offered little differentiation upon which a factfinder could perhaps conclude that some, but not all, of them happened. For instance, she testified generally that Mayorga "kept putting [the gun] in [her] face and loading a bullet into the chamber, and he'd do that multiple times." Upon further questioning, she indicated that these acts occurred in different locations in the room, and that sometimes Mayorga would say something (for instance, "I'm going to shoot you") while he pointed the gun at her. But in the main, Elise's testimony about the individual assaultive acts was undifferentiated; even Mayorga characterizes it as largely "general." We therefore agree with the State that—aside from possibly the one act discussed below—there was simply not any "reasonable basis for the jury to differentiate between" the assaultive acts that Elise described. Under circumstances like these, we discern no reasonable likelihood that the jury—which unanimously found that Mayorga possessed the gun—would have parsed these acts and believed that some of them but not all of them occurred: the jury was very likely either going to conclude that all of them occurred or that none of them did, and therefore a jury instruction about specific unanimity would not have been reasonably likely to result in a different outcome. *Cf. State v. Garcia*, 2024 UT App 38, ¶ 36, 546 P.3d 990 (concluding that no prejudice occurred from the absence of a specific unanimity instruction where the jury in connection with another count found that the defendant had committed rape, and stating that "we are incredulous that the jury that believed" the victim's account of the rape "would not have also believed her assertion that" the defendant committed aggravated sexual abuse by committing a similar act as part of the same course of conduct), *cert. denied*, 550 P.3d 997 (Utah 2024).

¶46 We acknowledge that Elise's description of one of the assaultive acts did come with some additional detail: at one point, she tried to leave the hotel room, and Mayorga "got in front of [her] and hit [her] with the nose of the gun in the chest." Elise testified that this event resulted in a rounded bruise appearing on her chest; she said she took photos of the bruise, but she deleted them because the bruise did not show up well in the photos. But even assuming, for purposes of the discussion, that some jurors could have concluded—based, perhaps, on the unlikelihood of bruising from that sort of contact or on the absence of any photos—that this act did not occur, we still see no reasonable likelihood of a different overall outcome had the jury received a specific unanimity instruction. For the reasons stated in the preceding paragraph, the other four (or so) acts described by Elise were generic and largely undifferentiated, and the same jury that concluded that Mayorga possessed the gun and committed assault with it during the evening would likely have unanimously concluded that at least one, if not all, of the other acts occurred.

¶47 Accordingly, given the particular facts of this case, we discern no reasonable probability of a different result on Count 5 in a counterfactual trial in which the jury received a specific unanimity instruction. We therefore conclude that Mayorga has not demonstrated that he was prejudiced by the absence of such an instruction, and on that basis we reject his claims of plain error and ineffective assistance of counsel.

CONCLUSION

¶48 Mayorga failed to preserve for appellate review any claim that Elise's testimony was inherently improbable and, on that basis, should be disregarded in connection with a sufficiency-of-the-evidence analysis. And with Elise's testimony included in the universe of evidence considered in that analysis, sufficient evidence exists to support Mayorga's three convictions. Finally, Mayorga has failed to demonstrate that he was prejudiced by the

absence of a specific unanimity instruction regarding Count 5, and for that reason he has not met the requirements for plain error or ineffective assistance of counsel. We therefore affirm Mayorga's three convictions.

———————