2025 UT App 151

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MIGUEL ANGEL NAVARRETE,
Appellant.

Opinion
No. 20230036-CA
Filed October 17, 2025

Third District Court, West Jordan Department
The Honorable Chelsea Koch
No. 161400358

Erick Grange, Attorney for Appellant

Derek E. Brown and Ginger Jarvis,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1 Miguel Angel Navarrete went to trial on three counts of sexually abusing his stepdaughter (Bella[1]). At the conclusion of the State's case, the court dismissed one of the counts, and the jury eventually acquitted Navarrete on another one. But the jury convicted him on the third count, and he now appeals that conviction, raising two challenges. First, he asserts that the trial court committed plain error in its jury unanimity instruction. Second, he claims that the court should have directed a verdict in his favor because Bella's testimony was inherently improbable. We reject Navarrete's arguments and affirm his conviction.

---

1. A pseudonym.

BACKGROUND[2]

¶2   In 2015, eight-year-old Bella lived with her mother (Mother), three sisters, one brother, and Navarrete, who was Mother's longtime partner. At the time, Bella had known Navarrete for years and referred to him as her "stepdad." Late that year, just before Christmas, Bella told her father (Father) and stepmother that Navarrete had been sexually abusing her. Father contacted police, and sometime later—after Bella had turned nine—she was interviewed at the Children's Justice Center (CJC).

¶3   At that interview, Bella stated that her "mom's boyfriend touches [her] a lot." She then described the first such incident—referred to in this opinion as "the broom incident"—which she said occurred when she was in the living room watching television; she said that, at the time, her brother was at a friend's house and Mother was asleep. She said that Navarrete "started getting drunk" and came into the living room and asked Bella if she knew where the broom was. While they were still in the living room, Navarrete touched her "butt" and her "front part" "inside [her] underwear." Bella said that, immediately thereafter, she and Navarrete went downstairs into her brother's bedroom to look for the broom, at which point Navarrete put her on her brother's bed "standing up" and again touched her "butt" and her "front part" "inside [her] underwear."

¶4   Bella also described a second incident—referred to here as "the second incident"—which she described as having happened when Mother and some of Bella's siblings left the house to drive relatives to an aunt's house. At the time, only one of Bella's sisters

2. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (cleaned up).

was home, but she was showering downstairs. Bella was again in the living room watching television, and Navarrete came inside the house and "started grabbing [her] and . . . touching [her]," again touching her "butt" and her "front part."

¶5     Later in the interview, Bella mentioned a third incident—referred to here as "the birthday incident"—which she described as having taken place at her sister's birthday party. Again, she stated that Navarrete touched her "butt" and her "front part."

¶6     Officers then contacted Navarrete, who was cooperative and agreed to speak to them; he denied that he had ever touched Bella inappropriately.

¶7     After concluding its investigation, the State charged Navarrete with three counts of aggravated sexual abuse of a child, all first-degree felonies, with one count for each of the three separate incidents Bella described in the CJC interview.

¶8     The case proceeded toward trial and, after some delays, trial was scheduled to begin on October 4, 2022. In advance of that trial setting, the State filed proposed jury instructions and proposed verdict forms with the court and served them on Navarrete's attorney (Counsel). One of the State's proposed instructions—later labeled Instruction 30—told the jury that Navarrete was charged with three counts and that evidence had been presented indicating that Navarrete had committed the offenses "both by touching [Bella's] genitals and by touching [Bella's] buttocks." And it told jurors that they could not convict Navarrete unless they "unanimously agree[d]" that the State had proved that Navarrete committed abuse "on that occasion in at least one of those two specific ways AND [they] unanimously agree[d] on the specific way or ways in which [Navarrete] committed the offense." Relatedly, the State's proposed verdict forms differentiated between the three charged counts and gave them labels (e.g., "the time he got the broom") and asked the jury

to "unanimously" and specifically decide, for each count, whether Navarrete had touched Bella "[o]nly on her genitals," "[o]nly on her buttocks," or "[o]n both her genitals and her buttocks."

¶9 The October 4 trial ended in a mistrial when an insufficient number of jurors appeared for jury duty. The trial was then rescheduled and set to begin just two weeks later, on October 18.

¶10 At that trial, which lasted three days, the State presented seven witnesses: Bella, Mother, Father, three police officers, and an expert witness who discussed the practice of forensic interviewing and other related areas. During her direct examination, Bella testified about the abuse. Consistent with her CJC interview—a video of which was apparently not played for the jury[3]—Bella described the broom incident as having begun in the living room while she was alone watching a movie. Bella recounted that Navarrete came inside from drinking with his friends and asked her "where the broom was" and that, after she told him she did not know, Navarrete put her on the table and started kissing her and touching her "butt and [her] vagina" under her clothing. But in contrast to her CJC interview, Bella's direct-examination description of the broom incident ended in the living room—she did not testify, in response to the State's questioning, that a subsequent touching had occurred downstairs in her brother's bedroom.

¶11 Bella went on to testify that, after the broom incident, she told Mother that Navarrete had touched her. As Bella described it, Mother was quite concerned and "started crying," and then began "yelling and crying to" Navarrete and "start[ed] getting [into] an argument" with him. Bella testified that her older sisters heard the commotion and asked what happened, and that she told

---

3. During both direct and cross-examination, the attorneys appear to have been working off a transcript of the CJC interview.

them too. She said that Mother then left the house with Bella and her siblings, and that they all stayed in a hotel that night.

¶12 Bella also described the second incident, which she testified happened after Mother "left with [Bella's] sisters" to drive relatives to the airport. This testimony differed somewhat from her CJC interview, in which she described relatives being taken to an aunt's house, not the airport.

¶13 When the prosecutor asked Bella if she could remember any other incidents of abuse, Bella stated that she could not. In particular, Bella offered no testimony about the birthday incident.

¶14 During cross-examination, Counsel asked Bella about the abuse she had described, and he attempted to impeach Bella by pointing out certain inconsistencies between her trial testimony and her CJC interview. Counsel asked Bella directly whether abuse during the broom incident occurred "only" in the living room or whether it also occurred elsewhere. Bella initially responded that it had only occurred in the living room. Later, however, Counsel came back to the subject, and this time he specifically asked whether Bella remembered "any event happening downstairs in [her] brother's bedroom." Bella again stated that she didn't "remember that," but then said, "Yeah, I do remember actually." She then stated that she had gone downstairs that day to check to see if the broom was in her brother's room and that while she was in her brother's room, Navarrete "grabbed [her] and put [her] on" her brother's bed and "started touching [her] again."[4]

---

4. In its brief, the State acknowledges that, with regard to the broom incident, Bella "described the same assault happening both in the living room and also downstairs." But then the State asserts that Bella later "correct[ed]" her testimony and stated "that it only

(continued…)

¶15 Later, Mother testified as part of the State's case-in-chief, and she gave a different version of events related to the broom incident. She acknowledged that she had taken Bella to a hotel that night. But she denied that Bella had ever told her that Navarrete had touched her inappropriately, and she stated that she took Bella to the hotel simply because she "got upset" after seeing Navarrete touch Bella's face and just wanted to avoid "any problems." Mother stated that, after she returned from the hotel, Navarrete told her that she "should never think that he would harm [her] daughter." And with regard to the second incident, Mother testified that she had never left Bella alone with Navarrete while she drove relatives to the airport. And she offered her view that Navarrete "[had] been a great father and stepfather."

¶16 At the conclusion of the State's case, Counsel moved for a directed verdict on the third count, the one involving the birthday incident. The State did not oppose that motion, and the court dismissed that charge.

¶17 Counsel also moved for a directed verdict on the other two counts. Regarding those charges, Counsel's argument, in its entirety, was as follows:

> With regard to the other counts, I'll just note that . . . in each instance the State's own witness, [Mother], . . . disputes the factual events as laid down by [Bella] in the first instance.
>
> [Mother] indicated that in fact [Bella] never disclosed abuse to her, but rather a completely different turn of events happened where [Mother]

happened in the living room." The State provides no record citation for this assertion and, as Navarrete accurately points out in his reply brief, this assertion is factually incorrect and is unsupported by the record.

> had witnessed [Navarrete] touching [Bella] on the cheek, [she took] issue with that, and then went and stayed at a hotel.
>
> With regard to the second count, [Bella] indicated that she was alone at home, and that directly contradicted [Mother's] testimony, which said she never left her at home alone taking the other sisters to the airport but leaving [Bella] alone with [Navarrete].
>
> So that's it, Judge.

In this brief argument, Counsel made no assertion that Bella's testimony was inherently improbable and gave no indication that he was asking the court to disregard it. After entertaining a brief response from the State, the trial court denied the motion, stating that the State had presented evidence from which "the jury could reasonably find that each of the elements were satisfied."

¶18 Next, the defense presented its case, and Counsel called three witnesses: Bella's older sister (Sister), Navarrete, and an expert witness who testified about child abuse investigation protocol and interview techniques. Sister offered her view that Navarrete was a "[r]eally great guy, feeding us, had a roof over our head, making sure we had shoes, clothes and just an amazing guy." But Sister did corroborate Bella's testimony that, after the broom incident, Bella disclosed to her that Navarrete had touched her inappropriately.

¶19 Navarrete then took the stand in his own defense. During his testimony, he denied ever inappropriately touching Bella. Indeed, he denied ever being alone with Bella or her sisters. He did acknowledge that, on occasion, he tickled Bella's stomach and kissed her face, and he stated that he was aware that Bella didn't like that contact. He testified that it was some of this sort of

unwanted contact that caused Mother and Bella to stay in a hotel on the night of the broom incident.

¶20   After the evidentiary presentations were completed, the court discussed jury instructions with the attorneys, outside the presence of the jury. The court began the discussion by noting that it had in its possession the State's proposed instructions (submitted in advance of the previous trial date) and its own stock instructions, but that it did not have any proposed instructions yet from the defense. The court asked Counsel if he intended to submit any proposed instructions, and a discussion ensued about some additional instructions, none of which involved jury unanimity. At the conclusion of that discussion, the court asked, "All right, anything else that we need to address here?" In response, Counsel stated, "No, . . . I don't think so."

¶21   The court then directed the parties' attention to the verdict forms that the State had submitted, and it asked whether those forms had been revised to reflect the dismissal of the birthday-party count. The State indicated that it had "re[done] the verdict form to remove the third count" and that it had also "slightly changed the wording." The court then asked Counsel if he had "had a chance to look at that," and Counsel said he had.

¶22   After this discussion, the court instructed the jury. Those instructions included Instruction 30, which stated (in relevant part) as follows:

> Counts 1 and 2 charge [Navarrete] with Aggravated Sexual Abuse of a Child. Evidence was introduced that the defendant may have committed the offense in each count both by touching [Bella's] genitals and by touching [Bella's] buttocks.
>
> You may not find [Navarrete] guilty on each count unless you unanimously agree that the

prosecution has proven that [Navarrete] committed Aggravated Sexual Abuse of a Child on that occasion in at least one of those two specific ways AND you unanimously agree on the specific way or ways in which the defendant committed the offense.

¶23 The attorneys then offered closing arguments. During the State's argument, the prosecutor described the two incidents as (1) "the one that led to this blow out argument between [Navarrete] and [Mother] where they all went to a hotel" and (2) the second time when Bella was alone with Navarrete. The prosecutor made no mention of the fact that Bella had described two separate touchings in connection with the broom incident. And during Counsel's argument, Counsel likewise made no mention of the fact that Bella had described two touchings in connection with the broom incident. That is, neither attorney made any effort to draw any distinction between parts of the broom incident.

¶24 Thereafter, the jury began its deliberations, and it was given two verdict forms. One was a general verdict form that asked the jury to check "guilty" or "not guilty" on each of the two counts, with one count described as "the time he asked for the broom" and the other count described as "the second time." The other was labeled "Special Verdict Form," and it asked the jurors to provide additional detail if they found Navarrete guilty of either count. In particular, this form asked the jury to "unanimously" determine, for each "guilty" count, whether Navarrete touched Bella "[o]nly on her genitals," "[o]nly on her buttocks," or "[o]n both her genitals and her buttocks."

¶25 After deliberation, the jury acquitted Navarrete on the count regarding the second incident. But the jury convicted Navarrete on the count regarding the broom incident. And it found that, with regard to that incident, Navarrete had touched Bella "on both her genitals and her buttocks."

¶26   Later, the trial court held a sentencing hearing, and the court noted that it had "struggled with . . . the inconsistencies in [Bella's] testimony that were brought to light by both [sides], candidly, at trial." The court also offered its view that "the jury struggled with that as well." For this and other reasons, and in "the interest of justice," the court sentenced Navarrete to a prison sentence of six years to life (rather than fifteen years to life).

## ISSUES AND STANDARDS OF REVIEW

¶27   Navarrete now appeals his conviction, and he presents two issues for our review. First, he argues that the trial court provided the jury with erroneous instructions regarding jury unanimity. He acknowledges that this issue is unpreserved, and he asks us to review it for plain error. Because a plain error claim "involves no lower court ruling, we decide the claim in the first instance as a matter of law." *State v. Dew*, 2025 UT App 22, ¶ 28, 566 P.3d 53, *cert. denied*, 568 P.3d 264 (Utah 2025).

¶28   Second, Navarrete challenges the court's denial of his directed verdict motion on the broom incident count. In particular, he asserts that Bella's testimony was inherently improbable and should not have been included in the court's assessment of whether sufficient evidence existed to support a conviction. "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168. But as we explain below, we review here only Navarrete's challenge to the court's denial of his general insufficiency claim; any claim that Bella's testimony was inherently improbable is unpreserved for our review, and—with

regard to this claim—Navarrete does not ask us to apply any of the exceptions to our preservation rules.[5]

ANALYSIS

I. Jury Unanimity: Plain Error

¶29    We turn first to Navarrete's assertion that the trial court committed plain error in instructing the jury about its obligation to render a unanimous verdict. Specifically, Navarrete argues that the court "failed to properly instruct the jury that it must unanimously agree about which act applied to Count 1 and failed to conclusively link Count 1 to a specific act or incident." Navarrete acknowledges that his challenge is unpreserved. But he asks us to review this issue for plain error, which is one of the three established exceptions to our preservation rules.[6] *See State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443.

¶30    To succeed on a plain error claim, an appellant must show that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶ 7, 544 P.3d 1046 (cleaned up), *cert. denied*, 550 P.3d 994 (Utah 2024). Thus, to prevail here, Navarrete must prove not only that there was an

_____

5. Navarrete filed a motion asking this court to resolve this case in expedited fashion without a written opinion, asserting that the issues presented in this case are uncomplicated issues of law. We have, of course, acted to resolve this appeal with dispatch, but we have elected to resolve it with this written opinion, and to that extent we deny Navarrete's motion.

6. Navarrete does not assert that Counsel rendered ineffective assistance by not objecting to Instruction 30 and the verdict forms.

error in the jury unanimity instructions, but also that the error was "so obviously and fundamentally faulty that the trial court should have stepped in . . . without specifically being asked to do so." *State v. Skinner*, 2020 UT App 3, ¶ 30, 457 P.3d 421. For the reasons discussed, we conclude that—on this record—Navarrete has not demonstrated that any error was so obvious as to warrant sua sponte trial court intervention.

¶31 The Utah Constitution states that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10; *see also* Utah R. Crim. P. 21(b) ("The verdict shall be unanimous."). The purpose of the jury unanimity requirement is to mandate "the full concurrence of all empaneled jurors on their judgment as to the criminal charges submitted for their consideration." *State v. Hummel*, 2017 UT 19, ¶ 25, 393 P.3d 314. It is not enough "if a jury unanimously finds only that a defendant is guilty of *a* crime." *State v. Mendoza*, 2021 UT App 79, ¶ 9, 496 P.3d 275 (cleaned up). Rather, "the jury must be unanimous on all elements of a criminal charge." *Id.* (cleaned up). The jury must not only be unanimous to the elements, but "jury unanimity means unanimity as to a specific crime." *Hummel,* 2017 UT 19, ¶ 28 (cleaned up).

¶32 Navarrete first asserts that the jury unanimity instructions and the accompanying verdict forms were erroneous. And on that score, Navarrete's argument has some force. Navarrete points out that, during Bella's cross-examination testimony, she testified that the broom incident contained two different touchings, one upstairs in the living room and the other downstairs in her brother's bedroom. Navarrete therefore asserts that the jury should have been instructed that "it must unanimously agree about which act applied to Count 1." Essentially, Navarrete maintains that the jury should have been given an instruction identical or similar to Model Utah Jury Instruction CR432, which is prescribed for situations in which there is "evidence of more occurrences than charges" and instructs juries that they "must be unanimous as to which

occasion and which act [the defendant] committed for each count." *See* Model Utah Jury Instructions 2d CR432 (2024) (cleaned up), https://legacy.utcourts.gov/MUJI/?cat=2 [https://perma.cc/3KGE-E4SF] [hereinafter MUJI 2d]. We agree with Navarrete that, given Bella's testimony about the broom incident, an instruction like this was supported by the evidence, and that—had Navarrete asked for it—such an instruction should have been given.

¶33 But this is not a case—like many others in this area—in which the parties and the court simply ignored the jury unanimity issue. Instead of asking for the unanimity instruction prescribed for situations in which there is "evidence of more occurrences than charges," the State asked the court to give a different unanimity instruction, namely, the one prescribed for situations in which a defendant stands accused of committing a "single offense in more than one way." *See* MUJI 2d CR430 (cleaned up). This model instruction—as well as Instruction 30, which was patterned after the model instruction—instructs jurors that they cannot convict unless they "unanimously agree that the prosecution has proven that [the defendant] committed [the crime] in at least one of those specific ways AND [they] unanimously agree on the specific way in which the defendant committed the offense." *Id.* This instruction was also supported by the evidence, given Bella's testimony that, during the broom incident, Navarrete touched her on her vagina and her buttocks.

¶34 Under the circumstances, it was not error for the court to have given Instruction 30. It is a correct statement of the law, it comes directly from the Model Utah Jury Instructions, and it was supported by the evidence at trial. Any error, then, was not in the giving of Instruction 30 but, instead, in the failure to have given a second and separate unanimity instruction, similar to Model Utah Jury Instruction CR432, stating that the jury needed to be unanimous "as to which occasion and which act [the defendant] committed for each count." MUJI 2d CR432.

¶35 Assuming for purposes of discussion that the absence of a second unanimity instruction was in fact erroneous, the question presented here is whether any such error should have been obvious to the trial court under the circumstances, such that the court was obligated to intervene sua sponte and give such an instruction. Under the circumstances, we cannot conclude that any error here was that obvious.

¶36 As an initial matter, we note that the parties, during trial, did not frame the broom incident as one that included multiple touchings. During her direct-examination testimony, Bella told the jury *only* about the living-room touching; she did not mention the downstairs-bedroom touching. Information about the downstairs touching came out only during cross-examination, when Counsel attempted to impeach Bella by pointing out inconsistencies between her trial testimony and her CJC interview statements, including that she had told the CJC interviewer about the downstairs touching. And in their arguments at trial, neither side emphasized—or even mentioned—the fact that there was evidence of two touchings during the broom incident; instead, both sides framed that incident as a monolithic event that potentially involved touching of both Bella's genitals and buttocks. Given the framing the parties put on the events, it would not have been obvious to the trial court that the "more occurrences than charges" jury instruction was warranted. *Id.*

¶37 Moreover, and significantly, our analysis here is informed by our "invited error" caselaw. "When an error is invited by an appellant, we will not review it even for plain error." *State v. Popp*, 2019 UT App 173, ¶ 23, 453 P.3d 657 (cleaned up). And this makes sense: after all, one of the three elements of a plain error claim is "obvious" error, and when the parties ask a trial court to take a particular action, any error in that action will usually not be obvious to the court. At a minimum, it seems unfair to hold the court responsible for an error that the parties asked it to make.

¶38 In this vein, we have noted that our supreme court's definition of what constitutes "invited error" varies depending on the context, and that "in the context of jury instructions, our supreme court has held that an instruction is not subject even to plain error review if counsel, in response to a question from the court about whether counsel has any objection to the instruction, answers in the negative." *Id.* (cleaned up). In *Popp*, for instance, we held that any error in jury instructions had been invited when "the court gave both attorneys a copy of the instructions and a chance to look them over, and then asked generally if anyone had any objection to any of them," and the defendant's "attorney stated plainly, on the record, that he did not." *Id.* ¶ 24. Other cases with similar facts exist. *See, e.g.*, *State v. Hamilton*, 2003 UT 22, ¶ 55, 70 P.3d 111 (holding that any error in jury instructions was invited where "[b]oth the prosecutor and defense counsel . . . affirmatively indicat[ed] that they had no objections to the instructions"); *State v. Ramos*, 2018 UT App 161, ¶ 23 n.9, 428 P.3d 334 (holding that any error was invited when counsel stated that he had no "issue with th[e] instruction"). Indeed, in *State v. Holsomback*, the State, defense counsel, and the court "worked together to compile [the] instructions," and at the end of the process, the court asked defense counsel if there were any objections to the instructions, and she responded, "No. Not really. I think they're mostly MUJIs." 2022 UT App 72, ¶ 37, 513 P.3d 82. And with regard to the specific instruction at issue on appeal, defense counsel stated that she was "fine with that." *Id.* Finally, at the end of the process, "the court asked the parties whether there was 'anything else' to discuss regarding the instructions," and defense counsel stated, "I think that's it." *Id.* (cleaned up). Under those circumstances, we concluded that any error in the jury instructions was invited and that plain error review was therefore inappropriate. *See id.*

¶39 The facts of this case are quite similar to the invited error cases we just described. During the jury instruction conference in

this case, the court began by noting that it had in its possession the State's proposed instructions and its own stock instructions, but that it did not have any proposed instructions yet from the defense. The court asked Counsel if he intended to submit any proposed instructions, and a discussion ensued about some additional instructions. At the conclusion of that discussion, the court asked, "All right, anything else that we need to address here?" In response, Counsel stated, "No, . . . I don't think so."

¶40 And with regard to the verdict forms, the court discussed with the attorneys the forms that had been submitted by the State, and it asked whether those forms had been revised to reflect the dismissal of the count related to the birthday incident. The State indicated that it had "re[done] the verdict form to remove the third count" and that it had also "slightly changed the wording." The court then asked Counsel if he had "had a chance to look at that," and Counsel responded in the affirmative. Thus, even after an extended discussion about the instructions and the verdict forms, and after having every opportunity to suggest instructions and lodge objections, Counsel effectively signed off on the instructions-and-verdict-forms package.

¶41 We need not necessarily conclude that the invited error doctrine applies here in order to conclude that any error in this set of jury instructions was not, and should not have been, obvious to the trial court.[7] As far as the trial court was concerned, the attorneys had discussed the matter and had handled jury unanimity issues to their satisfaction. They both signed off on the instructions and the verdict forms. On this record, we think it

_____

7. Indeed, the State does not argue that the invited error doctrine applies here, although it does argue that the jury instructions and verdict forms did not contain any obvious error. And we stop short of concluding that the doctrine applies here, because such a conclusion is unnecessary to our ultimate determination that any error was not obvious to the court.

would be unfair to the trial court to ascribe to it plain error because it opted not to jump in, without being asked, and amend jury instructions that the parties had agreed upon. In this situation, any errors in the jury instructions are better ascribed to the attorneys and not to the trial court.[8]

¶42     Accordingly, Navarrete's plain error claim founders on the second element, because he has not demonstrated that any error in the jury instructions and verdict forms was, or should have been, obvious to the trial court under the circumstances. On that basis, we reject his claim.

## II. Directed Verdict Motion

¶43     Next, Navarrete challenges the trial court's denial of his directed verdict motion on the broom incident count. In particular, he asserts that Bella's testimony was inherently improbable and should not have been included in the court's assessment of whether sufficient evidence existed to support a conviction. While Navarrete certainly preserved a general

---

8. Perhaps for this reason, our recent jury unanimity caselaw has arisen in the context of ineffective assistance claims, and not in the context of plain error claims. *See, e.g.*, *State v. Baugh*, 2024 UT 33, ¶ 15, 556 P.3d 35; *State v. Alires*, 2019 UT App 206, ¶ 15, 455 P.3d 636. Indeed, in some of these cases, we have expressly rejected plain error claims, even while proceeding to evaluate claims of ineffective assistance on the merits. *See, e.g.*, *State v. Carrick*, 2020 UT App 18, ¶¶ 33–35, 38–39, 458 P.3d 1167 (declining plain error analysis because counsel invited any error, but still analyzing the merits of an ineffective assistance of counsel argument); *State v. Popp*, 2019 UT App 173, ¶¶ 24–25, 453 P.3d 657 (finding the plain error exception "inapplicable" to the improper jury instruction claim, but still evaluating the issue under an ineffective assistance of counsel argument). But we need not do so here, because Navarrete does not raise an ineffective assistance claim.

insufficiency challenge, he did not preserve for appellate review the separate but related assertion that Bella's testimony was inherently improbable and should not have been considered in assessing his directed verdict motion, and he does not ask us to review that part of his challenge under any applicable exception to our preservation rules. We therefore do not consider the merits of that part of his challenge, and we reject his general insufficiency challenge on the merits.

¶44    In *State v. Robbins*, our supreme court held that "inherently improbable" testimony cannot support a verdict, and that such testimony can therefore be excluded from consideration in assessing whether sufficient evidence supports a verdict. *See* 2009 UT 23, ¶ 16, 210 P.3d 288. In situations like this one, where a defendant raises a *Robbins* claim in connection with a directed verdict motion, "our analysis has two parts." *State v. Barnes*, 2023 UT App 148, ¶ 19, 542 P.3d 108, *cert. denied*, 544 P.3d 459 (Utah 2024). First, we must analyze whether the evidence Navarrete claims is inherently improbable "is of such a poor quality that it should be disregarded." *State v. Jok*, 2021 UT 35, ¶ 30, 493 P.3d 665. Second, we must undertake the sufficiency analysis, considering only the evidence remaining after any inherently improbable evidence has been excluded. *See State v. Mayorga*, 2024 UT App 182, ¶ 28, 561 P.3d 1184, *cert. denied*, 568 P.3d 261 (Utah 2025); *see also Jok*, 2021 UT 35, ¶ 30 ("If the court determines that the challenged piece of evidence should be disregarded, it must then determine if sufficient evidence remains under which a reasonable jury could have convicted.").

¶45    But before we engage in that exercise, we must examine the extent to which Navarrete has preserved his claim. "A *Robbins* inherent-improbability claim is subject to a separate preservation requirement." *Mayorga*, 2024 UT App 182, ¶ 29. Such a claim must be separately preserved; simply moving for directed verdict based on insufficiency of the evidence is often not sufficient to preserve a *Robbins* claim for appellate review. *See State v. Doyle*,

2018 UT App 239, ¶ 19, 437 P.3d 1266 ("*Robbins* may be a component of an insufficiency challenge, but not every insufficiency challenge raises a *Robbins* issue."). A *Robbins* claim "introduces a new legal theory" separate from simple insufficiency, and it asks a court to review the sufficiency of the evidence "only *after* [certain] testimony is ignored as inherently improbable." *Id.* (cleaned up). And to preserve that theory for appellate review, a defendant must raise it to the trial court with enough specificity to allow the court to make a ruling on it. *See Mayorga*, 2024 UT App 182, ¶ 29 ("To preserve any issue for appellate review, the issue must be specifically raised such that the issue was sufficiently raised to a level of consciousness before the trial court." (cleaned up)); *see also State v. Skinner*, 2020 UT App 3, ¶ 29, 457 P.3d 421 ("A defendant who wants a trial court to disregard a witness's testimony under *Robbins* before, or in connection with, undertaking a sufficiency-of-the-evidence review must make that request known to the trial court so that the court has an opportunity to rule on the issue.").

¶46   In this case, by making a directed verdict motion at the close of the State's evidence and asserting that the evidence was insufficient, Navarrete certainly preserved a general insufficiency argument for appellate review. But in making that motion, Navarrete did not specifically preserve a *Robbins* claim for our review. As already noted, *see supra* ¶ 17, Navarrete's directed verdict motion was brief, and in it there was no assertion that Bella's testimony was inherently improbable or that it should be disregarded in any insufficiency analysis. To the contrary, Counsel pointed out only that critical parts of Bella's testimony had been refuted by Mother's testimony. There is simply no indication, in either the motion or in the trial court's eventual ruling, that any party intended for the court to consider whether Bella's testimony should be evaluated under *Robbins*.

¶47   Thus, the conclusion is inescapable that Navarrete failed to preserve any *Robbins* claim for appellate review. And Navarrete

does not ask us to review this claim under any of our established exceptions to our preservation rules. We therefore decline to consider the merits of Navarrete's *Robbins* claim. *See State v. Johnson*, 2017 UT 76, ¶ 18, 416 P.3d 443 ("A failure to preserve an issue in the trial court generally precludes a party from arguing that issue in an appellate court, absent a valid exception.").

¶48 As noted, however, Navarrete did preserve for our review a general insufficiency claim. It is somewhat unclear, from his briefing, whether Navarrete intends to advance a general insufficiency challenge on appeal. But assuming he intends to advance such a challenge, it fails on its merits.

¶49 The universe of evidence to be considered in any such general insufficiency challenge necessarily includes Bella's testimony, as well as all other evidence presented at trial. *See Mayorga*, 2024 UT App 182, ¶ 35. And that evidence is easily sufficient to support a verdict convicting Navarrete with regard to the broom incident. We will uphold a trial court's denial of a sufficiency challenge "if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 (cleaned up). Here, the evidence in the record, when viewed in a light favorable to the State, is enough to support a conviction. Bella testified that Navarrete put her on the table and started kissing her and touching her "butt and [her] vagina" under her clothing. And Sister at least partially corroborated that testimony, telling the jury that Bella told her later that evening that Navarrete had touched her inappropriately. Although much of this testimony was contradicted by Mother, we agree with the trial court that, based on this evidence, "the jury could reasonably find that each of the elements [of the charged crime] were satisfied."

¶50 Accordingly, we reject Navarrete's challenge to the trial court's denial of his directed verdict motion regarding the sufficiency of the evidence.

## CONCLUSION

¶51 Navarrete has failed to show that the trial court committed obvious error regarding the unanimity instruction, and for that reason he has not met the requirements for plain error. Navarrete failed to preserve for appellate review any claim that Bella's testimony was inherently improbable and, on that basis, we do not address that argument in connection with a sufficiency-of-the-evidence analysis. And when considering Bella's testimony in that analysis, sufficient evidence exists to support Navarrete's conviction. We therefore reject Navarrete's appellate arguments and affirm his conviction.

———————