2026 UT App 20

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAMES LOUIS JAMES,
Appellant.

Opinion
No. 20221106-CA
Filed February 12, 2026

Second District Court, Ogden Department
The Honorable Craig Hall
No. 211902816

Staci Visser and Ann Marie Taliaferro,
Attorneys for Appellant

Derek E. Brown and Alexandra Herlong,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1     A jury convicted James Louis James of three counts of aggravated sexual abuse of his daughter, and the trial court sentenced him to prison. He now appeals his convictions and sentence, asserting that his trial attorney rendered ineffective assistance in various respects. We find merit in one of James's arguments regarding one of the three counts, and we accordingly reverse James's conviction on that count and remand the case to the trial court for further proceedings on that count. But we reject all of James's other arguments, including those in his motion for a remand to the trial court for further factfinding on those arguments, and we therefore deny that motion and affirm his convictions and sentence on the other two counts.

## BACKGROUND[1]

### *The Abuse*

¶2    In 2021, when she was fifteen, Ashley[2] disclosed to her mother (Mother) that James—Ashley's father and Mother's former romantic partner—had sexually abused her several years earlier, when Ashley was in elementary school. The next day Mother reported the abuse to police, and a few days later Ashley was interviewed at the Children's Justice Center (CJC).

¶3    As Ashley described the events during her later trial testimony, the abuse began when she was ten years old and continued until she was twelve. When the abuse began, Ashley's parents were separated, and she spent half of each week with James and the other half with Mother. Ashley described incidents in which James would "rub" Vaseline "on the outside and the inside" of her vagina. She described feeling "paralyzed" and "confused" when James did this, and she said that "it would hurt and make [her] feel uncomfortable." These incidents would last for "multiple minutes," and James would tell Ashley that "[n]obody else [could] do it, only him." James would say that he needed to apply Vaseline because Ashley had a "rash," but Ashley only ever had a rash on her vaginal area when she was "very young, under five" years old, and never from age ten to age twelve. Beyond this, Ashley said that James would sometimes "grab" and "smack" her buttocks when she was walking upstairs and would sometimes touch her breasts.

---

1. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (cleaned up).

2. A pseudonym.

¶4    Ashley described three categories of incidents in additional detail. First, she testified that James had a swimming pool at his house and that before she would get into the pool, James would take off her swimming suit and "put Vaseline on [her] vagina to stop the rash" and "protect it from the swimming pool."

¶5    Second, Ashley testified that on "Friday mornings before school," after she was already dressed for the day, James would have her take the Vaseline from the hallway closet so he could "put it on [her]" before they left for school. Ashley said that during these incidents, she would lie "on the hallway floor" while he rubbed the Vaseline on her vagina.

¶6    Finally, Ashley described incidents involving showers and baths. She testified that James would "sometimes" join her in the shower and "stand super close to [her] and hug [her] while [they] were in the shower," that he would also wash her hair and scrub her back with a luffa, but that he never touched her "private[]" areas during the showers. He told her that they should shower together because he wanted to "sav[e] water." And when Ashley took a bath instead of a shower, James would fill the tub with only an "inch" of water—again, ostensibly to save water—making it so that "she'd have to roll around to get all wet," and James would sit on the toilet watching her. Her trial testimony included no specific mention of James touching her during these baths.

¶7    Ashley said that these incidents continued for about two years, then ceased during her sixth-grade year. She explained that, during that year, she attended a "DARE program" where students learned about "sexual assault awareness and drug awareness." After attending the DARE program, she went home and told James that she had learned that what had been happening was "wrong." And after that, the abuse "didn't happen again." At that point, Ashley still did not tell anyone in her family about the abuse, but she did tell her best friend (Friend), who told Ashley that James's behavior was "wrong" and "not normal" and that she

should report it to protect her little sister from getting "hurt in the same way."

¶8     At some point thereafter, Ashley told Mother that she wanted to spend more time with her. Mother reported that when she brought Ashley's request to James's attention, James responded by saying that Ashley was "an ungrateful bitch just like her mother." After that comment, James stopped coming to pick Ashley up, and she instead spent nearly all of her time at Mother's. According to Mother, after Ashley began spending more time at Mother's, Ashley became "reclusive" and "distant" and "didn't want to leave her room." Her grades fell and she began to sleep more, and Mother perceived that Ashley "didn't care about anything." Mother also noticed that Ashley would never take a bath—which Mother viewed as unusual—and instead chose to shower but would only do so at night. At some point during this time, Ashley disclosed to Mother that "her dad was touching her inappropriately."

*Pretrial Proceedings*

¶9     After investigating Ashley's allegations, the State charged James with three counts of aggravated sexual abuse of a child, all first-degree felonies. During a pretrial conference, the court pointed out that all three of the charged counts were described identically in the information, and it asked the attorneys for their input on what sort of clarification should be given to the jury about that. The State then clarified that it intended Count 1 to refer to "an incident regarding the swimming pool in the backyard," Count 2 to refer to "an incident as [Ashley was] getting ready to go to school," and Count 3 to concern "an incident or instances regarding showering and bathing." The court indicated that this clarification was "helpful," and it told the attorneys to come up with a way to communicate that information to the jury.

*The Trial*

¶10 The trial began a few days later, and during opening statements, the prosecutor explained that James had been charged with three counts of aggravated sexual abuse of a child, and the prosecutor clarified which acts were intended to go with which counts. He explained that Count 1 involved "a swimming pool" in the backyard and involved James "rub[bing] some Vaseline" on Ashley's vagina before she got in the pool. He explained that Count 2 involved "another incident" that took place on "a Friday morning" when Ashley was "about to head off to school" in which James rubbed Vaseline on her vagina. And the prosecutor explained that Count 3 involved showering and bathing, stating as follows:

> You will hear about the details of the showering, how whenever [Ashley] trie[d] to get into the shower, [James] would go in there and say hey, let's do this together because we need to save water. Again, taking a bath where he gives [her] one inch of water and tells her go ahead, there's your bath, roll around in it.

The State specifically mentioned that James would be "really close to" Ashley in the shower, that he "shampooed her hair," and that he "gave her a hug inside the shower." And when describing incidents in the bath, instead of describing physical contact, the State mentioned James only sitting "on the toilet seat and watch[ing] her."

¶11 During trial, the State presented testimony from eight witnesses, including Mother, Ashley, Friend, and James's former girlfriend (Stepmother), who all testified about the events described above. The State's other witnesses were Ashley's therapist, a forensic nurse, a CJC interviewer (Interviewer), and a detective.

¶12 Mother testified first, and she acknowledged that the statement she gave to police during the investigation contained an inaccuracy: it incorrectly stated that the abuse stopped when Ashley was in fifth grade (rather than sixth). She clarified that she had been

confused at the time she gave her statement, because she had confused the "maturation clinic" that Ashley had in fifth grade with the DARE program that Ashley had in sixth grade. On cross-examination, James's attorney (Counsel) inquired about when Ashley started to stay full-time with Mother, and Mother testified that this occurred about a year after James and Stepmother ended their relationship. Counsel also asked Mother about her initial report to police after Ashley disclosed the abuse. Mother testified that initially, because Ashley had yet to get "into very much detail," she reported that Ashley told her that the abuse "happened as long as she could remember until she reached the fifth grade." And because this differed from later reports, Counsel asked if Mother "made up things" when reporting this to police, to which Mother responded, "That was my understanding at that point."

¶13 On the morning of the second day of trial, the court discussed jury instructions with the attorneys. During this discussion, the State brought up the court's earlier concern about "identifying which count goes to which conduct," and it proposed adding a version of Model Utah Jury Instruction CR431, the instruction that addresses "jury unanimity" in cases involving "multiple offenses with identical elements." *See* Model Utah Jury Instructions 2d CR431 (2022), https://legacy.utcourts.gov/muji/?cat=2 [https://perma.cc /3VQQ-UCBC] [hereinafter MUJI 2d]. Counsel said he was "okay with" that approach.

¶14 Later during that same discussion, the attorneys announced that they had reached a stipulation regarding certain items of evidence. In particular, Counsel wanted to be able to use the transcript of Ashley's CJC interview, and the State agreed to stipulate to admission of that transcript in exchange for Counsel's agreement that the State could use a journal that Ashley had developed during therapy. But while the stipulation allowed the use of this evidence during questioning, the stipulation did not include an agreement that the CJC interview transcript could go back with the jury during deliberations; indeed, when the State later explained

these stipulations to the jury, it noted that the CJC transcript would "not be able to go back . . . for deliberations."

¶15 When trial resumed, Ashley took the stand. Regarding Count 3, the prosecutor asked Ashley to tell the jury "everything about [her] taking a shower" at James's house. After she testified about the shower incidents, the State asked her to talk separately "about when [she] would take a bath" at James's house. During cross-examination, Counsel asked questions that differentiated between the shower incidents and the bath incidents. For instance, Ashley clarified that during the shower incidents, James would "wash [her] hair" and "scrub [her] back with a luffa." Ashley stated that James had never touched her "privates" in the shower. And Counsel asked Ashley to confirm that during the bath incidents, James "never touched [her] there either," and Ashley said he did not.

¶16 Interviewer testified next. On cross-examination, Counsel utilized the transcript of Ashley's CJC interview. He started by asking Interviewer about Ashley's statements, in the interview, about James touching her buttocks and chest. He clarified with Interviewer that these touchings were "over the clothing." Counsel also used the transcript to frame questions about how the inside of the house's hallway looked and how James would carry Ashley into the bathroom before showers and baths. He specifically emphasized that when Ashley spoke to Interviewer about the shower incidents, she described James washing her body and hair but never described "anything about an erection or anything of that nature." Counsel also pointed to a part in the transcript where Ashley told Interviewer that the abuse stopped once she learned about sexual assault in the DARE program. And Counsel asked Interviewer, "Are you aware that the DARE program really talks about drugs and police and . . . safety, that kind of thing, not sexual abuse?" Interviewer responded in the affirmative.

¶17 After that, Ashley's therapist took the stand. It was through her testimony that the State admitted Ashley's therapy journal.

During therapy, the therapist had asked Ashley to respond to a series of prompts to help her "open" and "soften up" when recounting the "story that had caused [her] distress," and Ashley recorded her responses to these prompts in the journal. On one of the pages of the journal, Ashley was prompted to write about the "person that hurt" her. There she described James, his character, his work, and his friends, but she did not mention the abuse. On the page describing "[w]hat happened," Ashley wrote that it was "traumatic and kind of crazy." She also wrote that there were good times but with that "came bad" times, like James "showering with [her]" and "touching [her] in [inappropriate] places." Ashley also wrote about learning about sexual assault in the DARE program and about the abuse stopping after telling James what she had learned. Other pages of the journal included Ashley's observations about how other people found out, what she learned from counseling, the hardest part of her story, her safety plan, and her future—all of which was substantially similar to her trial testimony.

¶18   The State also called Stepmother to testify. Stepmother started dating James when Ashley was five years old, and over the years Ashley and Stepmother became "very close" and spent a lot of time together. Stepmother testified that during the years in question, there were "rarely" times when James would be alone with Ashley. Stepmother also testified that even after she and James ended their relationship, she remained "involved" with Ashley for another "couple years," and she testified that Ashley had "a hard time" with her and James's breakup.

¶19   After the State rested its case, Counsel presented James's defense, and he called five witnesses: a friend and colleague of James, James's uncle (Uncle), James's mother, an expert witness on manufactured memory (Expert), and James himself.

¶20   Uncle testified about his observations of interactions between James and Ashley, the relationship between James and Mother, and the layout of James's house. He also stated that he had not been on

speaking terms with James for the last three years and had only "just barely started communicating" with him again. Then on cross-examination, the State brought up a previously undisclosed telephone conversation one of its prosecutors had with Uncle before trial in which Uncle stated as follows: "We just barely started communicating . . . and as much as I don't like him, I don't believe that—you know, what I'm saying is I kind of thought that he did it." Uncle attempted to explain away his comment by stating, "Because of the fact that we weren't talking. I guess what I was trying to say was I never thought he did it. What I wanted to say was I was fighting with him, so it was his deal, you know, whatever, whatever." On redirect, Counsel then asked to "play another couple of minutes of the tape immediately after that." The State agreed, and the jury heard the following portions of the phone call:

> [Y]ou know, what I'm saying is I kind of thought that he did it, because of—I didn't like him.
>
> . . . .
>
> First of all I want to tell you that I've seen [Ashley] grow up, and [James has] been nothing but a great dad to her. In fact, she hated to go back to [Mother].
>
> . . . .
>
> You know, she loved being with [James].

Counsel then asked Uncle to clarify what he meant by those comments, and Uncle responded, "[W]hen [the prosecutor] was talking to me about that, what I was getting at was that, you know, I didn't care what happened to [James] at this point because we were not really talking. Then we reconciled after that, and I think I said on that tape that, you know, that was basically why I said that. That wasn't that I actually thought that he'd ever done it."

¶21 After the second day of trial ended, the parties and the court finished their discussion about jury instructions. In discussing the jury unanimity issue, the court observed that MUJI 2d CR431—a version of which the attorneys had already agreed should be given—requires a "description with respect" to each count. The State and Counsel then agreed to come up with a stipulated version of that instruction by the next morning. During this discussion, neither the State nor Counsel asked for or mentioned MUJI 2d CR432, a different unanimity instruction designed for situations in which the State presents evidence of more occurrences than charges. And the next morning, Counsel said he had "looked through" the CR431 instruction, which was drafted by the State, and thought it was "totally accurate." The instruction—which was given to the jury as Instruction 29—described the three counts as follows:

- Count 1 is based on the alleged conduct of the pool incident occurring between December 10, 2015 to December 10, 2018.

- Count 2 is based on the alleged conduct of the Friday morning before school incident occurring between December 2015 to December 10, 2018.

- Count 3 is based on the alleged conduct of the showering/bathing incident occurring between December 10, 2015 to December 10, 2018.

¶22 On the third day of trial, the parties discussed some outstanding procedural matters. During this discussion, the court asked whether both the CJC transcript and the therapy journal were to go "into the jury room with the jury." Counsel responded, "No." And the State agreed, stating, "No, . . . [t]he rules are quite clear, the CJC video or the CJC transcript cannot go back with the jury for deliberations." Both attorneys did agree, however, that the therapy journal could go back with the jury. The court then said, "The journal will be sent back to be reviewed by the jury," "[b]ut the CJC transcript will not." And the court concluded the discussion by

stating, "[W]e're going to keep the CJC transcript and not have that go back with the jury during deliberations, as everyone has agreed."

¶23 After that, the defense presented testimony from two more witnesses: Expert and James. Expert provided testimony on false memory and memory malfunction. He testified about the fallibility of memory, citing research and articles he had studied. On cross-examination, the State pointed out that Expert had only ever testified for defendants and had previously "testified on this exact topic" with Counsel "on the same type of child sex assault jury trial" about a year and a half prior. And in a further effort to impeach, the State elicited an acknowledgment from Expert that his license had once been temporarily suspended, almost twenty-five years earlier, "for a boundary violation" and an "inappropriate sexual relationship with a client."

¶24 The last person to testify was James himself. During his testimony, he consistently denied the allegations against him. Counsel asked James about Ashley's testimony about the DARE program, and James testified that all he remembered about the DARE curriculum was "basically" "drugs and alcohol." With that, the defense rested.

¶25 During closing arguments, the prosecutor began by clarifying that the case was about three incidents: "an incident involving Vaseline and the swimming pool," "another incident involving Vaseline and Friday morning [before] school," and "the 'saving water' incident" that had to do with "shower[ing] and bathing." In recalling Ashley's testimony about the swimming pool incident, the State said, "[S]he talked about . . . the swimming pool in the backyard and how before she was able to get into that swimming pool . . . [James] would say okay, let's come here first." And when describing Count 3, the State said, "[Ashley] also talked about showers and how when she takes showers . . . [James] would be super close to her, and he would hug her in the shower." Also regarding Count 3, the State said, "She talks about baths or bathing."

To emphasize its point on Count 3, the State began quoting directly from the CJC transcript, even reading some excerpts that had not been previously read or referred to during witness testimony. For instance, the State read an excerpt in which Ashley stated that during the bath incidents, James would put very little water in the tub and would make her "roll around to wash [her] body" and then "when [she] couldn't . . . , he would . . . have to do it for [her]." And the State read another excerpt where Ashley stated that James "would use . . . a luffa, so it was just . . . fast, and he would do it a lot then, but then [she] started showering at night." Counsel lodged no objection to the State's recitation, during closing argument, of CJC transcript quotes that had not been previously introduced to the jury during witness testimony.

¶26   During his closing argument, Counsel characterized Ashley's account of abuse as "manufactured memories." He posited that the events Ashley described might have "actually happened, but not in the way that she sa[id]," and that the incidents had "morphed" in Ashley's mind "from a totally innocent and appropriate action by [James] into something criminal." He pointed out that Ashley had been confused about whether she learned about sexual assault in the DARE program, and in arguing that Ashley had manufactured false memories, Counsel referred to Interviewer's testimony that "the DARE program talks about drugs and police interaction" but not "sexual issues." He also emphasized that, during her testimony, Interviewer confirmed that Ashley, during her CJC interview, did not "describe any touching sexually" during the shower incidents or say that James "had an erection" during those incidents. And in relation to what Counsel called "the washing and the bathtub" incidents, Counsel referenced the State's closing argument and recited that the State had pointed to Ashley's statements that during the bath incidents, James would "use a luffa" and "would wash her back" and "her hair." He noted that other stressful factors could have affected Ashley's memory, and he mentioned the breakup between James and Stepmother (which had occurred only a few months before Ashley disclosed the abuse). Finally, Counsel pointed

out some of the inconsistencies between Ashley's and Mother's testimony about the timeline of events (fifth grade versus sixth grade, for instance), calling those inconsistencies a "problem" for the State because Mother's "significantly different story" could not be "corroborating evidence."

¶27     On rebuttal, the State emphasized the three different counts. It again described the counts "[b]ased on specific disclosures," with Count 1 being the "swimming pool incident," Count 2 relating to the "Friday morning going to school incident," and Count 3 as "the shower and the bath" incident. In reference to the physical contact and sexual gratification element of the charge, the prosecutor again discussed Count 3 and asked the jury to use its "common sense" because James "bathed [Ashley] and showered with her" and "[i]f he bathed her, he probably bathed her entire body."

¶28     After the jury left to deliberate, the court discussed what evidence was to go back with the jury into the jury room. The court said, and Counsel agreed, that "the only exhibit . . . that need[ed] to go back . . . [was] the journal." But despite this instruction, a copy of the CJC interview transcript somehow ended up going back with the jury during deliberations. And after deliberating, the jury found James guilty as charged on all three counts.

*Sentencing*

¶29     A few weeks later, the court held a sentencing hearing. At the outset of that hearing, the court indicated that it had reviewed the presentence investigation report and the "victim impact statement," as well as "dozens of letters sent in from family members and friends, both in support of [Ashley] and also in support of [James]." When it was his turn to address the court, Counsel acknowledged that the presumptive sentence was "15 to life" on each count, but he pointed out that the court was "well aware" that it wasn't "bound by that." In particular, Counsel noted that the court could suspend any prison sentence and "grant probation," and that the court could "do whatever [it wanted] as far as sentencing [was] concerned."

Counsel specifically asked the court "to deviate" from the presumptive sentence. Counsel pointed out that James had no previous criminal record, and he argued that James was not "a danger to himself or others," especially considering the fact that it had been "four or five years until this thing was presented to the police, and he [hadn't] committed anything." Counsel ultimately asked the court to sentence James to "160 days in jail" followed by "probation" with conditions, including "any class or counseling that is deemed necessary by the [c]ourt."

¶30 In response, the State asked the court to impose consecutive prison sentences of fifteen years to life. In particular, the State argued that James had not accepted responsibility for his actions, as exemplified by a comment James made to the probation officer preparing the presentence investigation report in which James said, "This whole thing was a fucking joke." In that same vein, the State also emphasized the probation officer's comment that James's "behavior was disrespectful and unwarranted" and that he had a "poor attitude towards the present offenses."

¶31 Ultimately, the court sentenced James to fifteen years to life in prison on all three counts, but it ordered that the sentences run concurrently to one another.

ISSUES AND STANDARDS OF REVIEW

¶32 James now appeals both his convictions and his sentence, asserting that Counsel rendered constitutionally ineffective assistance. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law" that we address in the first instance. *See State v. Rivera*, 2022 UT App 44, ¶ 21, 509 P.3d 257. James acknowledges that some of his ineffective assistance claims cannot be supported by the evidence in the record, and with regard to these claims he seeks a remand, pursuant to rule 23B of the Utah Rules of Appellate Procedure, to enable him to supplement the record with evidence to support the claims. "A remand under

rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Tuinman*, 2023 UT App 83, ¶ 53, 535 P.3d 362 (cleaned up).

## ANALYSIS

¶33    To succeed on an ineffective assistance claim, James must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal to the claim; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶34    The first part of the test requires James to show that Counsel's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (cleaned up). When determining reasonableness, courts often look to whether the actions counsel took were motivated by trial strategy. *See id.* ¶ 35 ("[T]he performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

¶35   If deficient performance is established, James must next show that he was prejudiced by that performance. To establish prejudice, he "must show that there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A defendant trying to show that there is a "reasonable probability of a different outcome" faces "a relatively high hurdle to overcome." *State v. Garcia*, 2017 UT 53, ¶ 44, 424 P.3d 171.

¶36   In this case, James claims that Counsel rendered ineffective assistance in ten different ways. James attempts to support the first three claims by referencing evidence already in the record. But he acknowledges that the other seven claims are unsupported by the record, and with regard to these claims, he seeks an order of remand to the trial court so that he can supplement the record to support his claims. We first discuss the three claims that James supports with record evidence, and we then turn to a discussion of the seven rule 23B claims. For the reasons discussed below, we reject all of James's claims except the jury unanimity claim regarding Count 3, and we deny his motion for a rule 23B remand.

## I. Record-Based Claims

¶37   James makes three ineffective assistance claims that are grounded in evidence already in the record. First, he asserts that Counsel rendered ineffective assistance by choosing to stipulate to the admission of Ashley's therapy journal in exchange for the State's stipulation to the admission of the CJC transcript. Second, he asserts that Counsel rendered ineffective assistance at sentencing when he argued for probation but did not specifically ask the court, in the alternative, to impose a shorter prison sentence. And third, he asserts that Counsel rendered ineffective assistance by not requesting more specific jury instructions regarding unanimity. We discuss each of these claims, in turn.

A.      Evidentiary Stipulation

¶38     James asserts that Counsel's assent to the stipulation that allowed both the CJC transcript and Ashley's therapy journal to be admitted at trial constituted ineffective assistance because, as James now sees it, that stipulation benefited only the State and worked to James's detriment. Indeed, James asserts that he gained "[n]othing beneficial" as a result of this stipulation. In our view, the record does not support this assertion, and we therefore decline to second-guess Counsel's decision to enter into the evidentiary stipulation.

¶39     An attorney's "reasonably informed strategic choices are almost unassailable" in a deficient performance inquiry. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 96, 267 P.3d 232; *see also State v. Rivera*, 2022 UT App 44, ¶ 37, 509 P.3d 257 ("If it even appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." (cleaned up)). Indeed, any "decision by counsel that reasonably weighs the risks and benefits of available strategic approaches before choosing one as preferable to others cannot support a claim that counsel was deficient in either strategy or performance, even if the approach did not lead to the desired result." *State v. Franco*, 2012 UT App 200, ¶ 10, 283 P.3d 1004.

¶40     Here, Counsel's decision to enter into the stipulation James now challenges was unquestionably a strategic one. Thus, James can prevail on his challenge to that decision only if he demonstrates that Counsel's decision was objectively unreasonable. *See State v. Dew*, 2025 UT App 22, ¶ 64, 566 P.3d 53 ("In evaluating whether counsel was deficient, we will not second-guess trial counsel's legitimate strategic choices." (cleaned up)), *cert. denied*, 568 P.3d 264 (Utah 2025); *see also Rivera*, 2022 UT App 44, ¶ 38 ("[S]o long as counsel could have reasonably chosen the strategy in question, and so long as the strategy is itself reasonable, the claim must fail."). And we disagree with James's contention that Counsel's strategy here was objectively unreasonable.

¶41 To be sure, Counsel's decision to enter into the stipulation carried certain risks, and it is probably fair to say that not every attorney would have chosen that strategy. But we disagree with James's assertion that the strategy "served no defense purpose" and did not benefit James at all. By gaining access to the CJC transcript, Counsel had more options in questioning Interviewer. And Counsel used the transcript to elicit a number of clarifications from Interviewer that Counsel believed would bolster the manufactured-memory defense. For instance, during cross-examination, Counsel was able to use the transcript to obtain Interviewer's clarification that, during the interview, Ashley stated that James only ever touched her buttocks and chest "over the clothing." And he was able to clarify that when Ashley described James showering with her, she never described "anything about an erection or anything of that nature," which supported Counsel's assertion that the incidents Ashley remembered had been innocent rather than sexual. Thus, we see at least some benefit to Counsel's overall defense from being able to use the CJC transcript at trial.

¶42 Moreover, our review of the record indicates that admission of the therapy journal—the other side of the stipulation coin—had little (if any) negative impact on James's position at trial. In the journal, Ashley answered general prompts about the abuse and her experiences thereafter to help her "open" and "soften up" by recounting the "story that had caused [her] distress." But the journal contains little (if any) information that hadn't already come into evidence through other sources, such as Ashley's testimony. *See supra* ¶ 17. On this record, Counsel could have reasonably believed that admission of the journal was overall neutral and did not harm James's case, and that admission of the CJC transcript would provide at least some benefit to the manufactured-memory defense.

¶43 Accordingly, we cannot say that Counsel's decision to enter into this evidentiary stipulation was objectively unreasonable. On this basis, we conclude that James has not demonstrated that Counsel performed deficiently by electing to enter into it.

B.      Argument at Sentencing

¶44     Next, James asserts that Counsel rendered ineffective assistance during the sentencing hearing by not specifically asking for a shorter prison sentence.[3] He asserts that in this case, it was unreasonable for Counsel not to specifically ask for a lesser minimum prison sentence of six or ten years instead of fifteen. On this record, we disagree.

¶45     While Counsel did not specifically request a lesser minimum prison sentence, Counsel did ask the court not to impose a prison sentence at all and to instead suspend any prison sentence and place James on probation. As noted, *see supra* ¶ 29, Counsel acknowledged the presumptive sentence of "15 to life" but also observed that the court was not "bound by that" and that it could "do whatever [it wanted] as far as sentencing [was] concerned." Indeed, Counsel made a specific request that the court "deviate from" the presumptive minimum sentence. In this vein, Counsel asked the court to "grant probation" instead of sending James to prison. Thus, Counsel apparently elected to go with something of an "all-or-nothing" strategy at sentencing.

¶46     In other contexts—most notably when assessing an attorney's choice to seek a lesser-included-offense instruction—we have held that an attorney's choice to go with an all-or-nothing strategy is risky but not unreasonable. *See State v. Devan*, 2024 UT App 193, ¶ 42, 562 P.3d 1233 (explaining that "counsel may have

---

3. In his opening brief, James also asserted that the trial court's sentence constituted plain error. But in his reply brief, James withdrew this argument, acknowledging that because Counsel did not specifically argue for a shorter prison sentence—and instead chose to argue only for probation—the trial court did "not have an obligation to consider" imposing a shorter prison sentence and therefore could not have plainly erred by not doing so. (Citing *State v. Norton*, 2021 UT 02, ¶ 108, 481 P.3d 445.)

perfectly valid tactical reasons to forgo the instruction and to instead present an all or nothing defense that entails avoiding a lesser-included offense instruction in the hopes the jury will find the defendant totally innocent of *any* wrongdoing" (cleaned up)), *cert. denied*, 568 P.3d 261 (Utah 2025). In our view, the same principles apply here: the choice to take an all-or-nothing stance at sentencing is certainly a risky ploy, but it will not be deemed deficient performance unless the strategy is objectively unreasonable.

¶47     And here, we cannot say that Counsel's strategy was objectively unreasonable. While risky, Counsel's choice to push for the only outcome that could spare James from prison did not constitute deficient performance. Counsel made sure that the court was aware of its ability to "deviate from" the presumptive minimum sentence and impose a sentence the court believed was just. And Counsel provided the court with multiple reasons for not sentencing James to prison, including that James had no previous criminal record and that he was not "a danger to himself or others," especially considering his lack of offenses while released during the pretrial period. Counsel's risky approach will not be deemed unreasonable merely because it "did not lead to the desired result." *Franco*, 2012 UT App 200, ¶ 10. On this basis, we reject James's second claim of ineffective assistance.

C.     Jury Unanimity

¶48     In his last record-based ineffective assistance claim, James raises a jury unanimity issue. Specifically, he asserts that because the State turned "purported singular incidents into repeated acts on repeated occasions," it "ultimately gave the jury a number of incidents and acts to choose from" when considering the charges against James. And James points out that there was evidence presented of multiple incidents within each category—before entering the swimming pool, on a Friday morning before school, or in the shower and bath—making it potentially unclear which incident supported each count. He also argues that the State detailed

different types of incidents within the "shower and bath" category. We conclude that James would have been entitled to a more specific unanimity instruction, had he asked for one. And we conclude that James has shown both deficient performance and prejudice regarding Counsel's failure to seek such an instruction regarding Count 3. But we reject James's similar claim regarding Counts 1 and 2 because James cannot demonstrate that, on those counts, he was prejudiced by Counsel's performance.

1.      Correctness of the Unanimity Instructions

¶49      As an initial matter, James is correct that, in this situation, he would have been entitled to a more specific jury unanimity instruction had he asked for one. Utah's constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. "At its most basic level, this provision requires the full concurrence of all empaneled jurors on their judgment as to the criminal charges submitted for their consideration." *State v. Hummel*, 2017 UT 19, ¶ 25, 393 P.3d 314. And it is "well-established" that this requirement "is not met if a jury unanimously finds only that a defendant is guilty *of a crime*." *Id.* ¶¶ 26, 30 (cleaned up). Our constitution "requires unanimity as to each count of each distinct crime charged by the prosecution and submitted to the jury for decision." *Id.* ¶ 26 (cleaned up). Indeed, "a generic guilty verdict that does not differentiate among various charges would fall short." *Id.* (cleaned up).

¶50      On the facts of this case, there were two potential jury unanimity problems. First, the information charged James with three identically worded counts of aggravated sexual abuse of a child, and neither the counts themselves nor the probable cause statement gave meaningful guidance regarding which acts went with which count. This is the problem that MUJI 2d CR431—the model instruction for cases involving multiple offenses with identical elements—is designed to remedy. The trial court raised this issue with the attorneys prior to trial, and the attorneys worked

together to create a jury instruction—modeled after MUJI 2d CR431—that identified which acts went with which counts, and that instruction was ultimately given to the jury. *See supra* ¶ 21. And the prosecutor, during opening statement and closing argument, repeatedly emphasized this point for jurors, reminding them on several occasions which category of incidents went with each charged count. In this way, the court and the attorneys solved the first jury unanimity problem posed in this case.

¶51 But they didn't adequately solve the second. That problem was that the State charged James with only one count for each category of incidents, but for each specified category the State presented evidence that abuse occurred on multiple occasions. In particular, Ashley testified that James abused her multiple times before she entered the swimming pool; that he abused her multiple times before school on Fridays; and that he abused her multiple times while showering or bathing. Thus, the State presented evidence of more occurrences of abuse than there were charges, and *that* is the problem MUJI 2d CR432 is designed to remedy. Indeed, this instruction is recommended for situations—like this one—in which the "prosecution argues that [the defendant] may have committed [a crime] more times than the number of charged counts." *See* MUJI 2d CR432 (2024). The instruction makes clear that the jury "must be unanimous as to which occasion and which act [the defendant] committed for each count." *Id.* In this case, James would have been entitled to a more specific unanimity instruction—along the lines of MUJI 2d CR432—had he asked for one. *See State v. Navarrete*, 2025 UT App 151, ¶ 32, 580 P.3d 379 (determining that MUJI 2d CR432 "should have been given" where an act of abuse labeled "the broom incident" included "two different touchings, one upstairs in the living room and the other downstairs").

2. Counts 1 and 2

¶52 With regard to Counts 1 and 2, we need not definitively determine whether Counsel's failure to ask for a more specific

unanimity instruction constituted deficient performance, because we conclude that—even if it did—James has not borne his burden of demonstrating that, with regard to Counts 1 and 2, any deficient performance resulted in prejudice.

¶53   "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In this context, "prejudice analysis is counterfactual, and so we must envision, for purposes of our analysis, an alternative universe in which the trial went off without the error, and then assess whether the hypothetical trial is reasonably likely to have turned out differently from the actual trial." *State v. Mayorga*, 2024 UT App 182, ¶ 42, 561 P.3d 1184 (cleaned up), *cert. denied*, 568 P.3d 261 (Utah 2025). Here, we must envision a hypothetical trial in which James requested, and was given, a more specific jury unanimity instruction, akin to MUJI 2d CR432, and we must ask whether it is reasonably probable, in that trial, that the outcome would be different.

¶54   With regard to both the "swimming pool" incidents and the "Friday morning" incidents, Ashley did indeed testify that more than one incident occurred. But her testimony about these categories of incidents was entirely undifferentiated—that is, she made no effort to distinguish between individual "swimming pool" incidents or individual "Friday morning" incidents. Instead, with regard to the swimming pool incidents, she testified simply that James "would put Vaseline on [her] vagina to stop the rash" and to "protect it from the swimming pool." And with regard to the Friday morning incidents, she testified that she would lie "on the hallway floor" and that James would then "put Vaseline on [her] vagina."

¶55 In situations like this, where the evidence offers a factfinder "no meaningful and relevant basis upon which to distinguish the various acts underlying the charges," it is difficult for a defendant to demonstrate prejudice based on the mere "absence of a jury unanimity instruction." *State v. Mottaghian*, 2022 UT App 8, ¶ 66, 504 P.3d 773. In such situations, a factfinder has no evidentiary basis upon which to differentiate between the acts in each category and therefore has no basis upon which it might conclude that only some, but not all, of the acts took place. Stated another way, a jury in this situation will have "no difficulty in unanimously agreeing that any one of the relevant criminal acts supported the charges." *Id.*; *see, e.g.*, *State v. Elton*, 2026 UT App 7, ¶ 62 (concluding that a defendant could not show prejudice arising from a lack of a more specific jury unanimity instruction where "the evidence as to each count was essentially identical" and, therefore, if the defendant "was guilty of doing one of the acts—which the jury found he was— he was guilty of them all"); *Mayorga*, 2024 UT App 182, ¶ 45 (stating that there was "little differentiation upon which a factfinder could perhaps conclude that some, but not all, of [the instances] happened" when all five of the instances of assault "occurred on the same evening, in the same hotel room, with the same gun, involving the same two people, and as part of the same continuous course of conduct").

¶56 In this case, the swimming pool incidents Ashley described were all indistinguishable from one another, as were the Friday morning incidents she described. In this situation, while James would have been entitled to a more fulsome unanimity instruction had he asked for one, there is no reasonable probability of a more favorable outcome with respect to Counts 1 and 2 in a hypothetical trial in which such an instruction were given, because on those counts "there was simply not any reasonable basis for the jury to differentiate between" the acts Ashley described. *See Mayorga*, 2024 UT App 182, ¶ 45. For this reason, we reject James's ineffective assistance claim regarding jury unanimity on Counts 1 and 2.

3.      Count 3

¶57     Our analysis with regard to Count 3 is different in several respects. On this count, we conclude that James has borne his burden of demonstrating both deficient performance and prejudice, and we therefore find merit in James's claim that Counsel rendered ineffective assistance by not seeking a more specific jury unanimity instruction regarding that count.

a.      Deficient Performance

¶58     A line of recent Utah cases "stand[s] for the proposition that when the State presents evidence that a defendant has committed more criminal acts than the number of charged counts, a jury unanimity concern may be present and an attorney may perform deficiently by not asking for a specific unanimity instruction." *State v. Jimenez*, 2025 UT App 76, ¶ 42, 571 P.3d 834 (citing cases), *cert. denied*, 581 P.3d 560 (Utah 2025). When assessing whether counsel performed deficiently, we look to "whether there could have been a sound strategic reason for counsel's actions" and, ultimately, "whether that conduct was objectively reasonable." *Scott*, 2020 UT 13, ¶ 35. In this context, our supreme court has recognized that declining to ask for an instruction along the lines of MUJI 2d CR432—even when the facts warrant it—does not *always* constitute deficient performance. *See State v. Paule*, 2024 UT 2, ¶¶ 68, 78, 554 P.3d 844. For instance, actions by the State, through "prosecutorial election," that make explicitly clear which act forms the basis of the specific charge during the presentation of its case may obviate the need for a specific instruction and, depending on the circumstances, it may be reasonable for a defense attorney to rely on the State's identification and forgo a request for a more specific unanimity instruction. *See id.* But for such a strategy to be reasonable, the State's "prosecutorial election" must be "clear." *See id.* ¶¶ 68, 78, 82–83.

¶59     In this case, the State's attempts to clarify the situation were not clear enough to make it reasonable for Counsel to have forgone a request for an instruction like MUJI 2d CR432. Here, the State's

clarifications served to solve only the *first* unanimity problem: indicating which *category* of incidents went with each count. The State made no effort to provide any clarification about which shower or bath act represented the act charged in Count 3, which gave rise to the possibility that some jurors might use evidence of the shower acts to satisfy the elements of Count 3, while others might use evidence of the bath acts to support a conviction. *See Jimenez*, 2025 UT App 76, ¶ 53 ("In the absence of a clear election from the State, the jury is entitled to—and likely will—examine and consider all of the supported instances of abuse in considering whether to convict."). Counsel could therefore not have been relying on the State's clarification efforts in choosing not to ask for MUJI 2d CR432. And we are unaware of any other strategic reason Counsel may have had for forgoing such a request. In this situation, a reasonable attorney would have made that request, because without an instruction like MUJI 2d CR432, the burden of proof is "effectively lowered." *See State v. Baugh*, 2024 UT 33, ¶ 40, 556 P.3d 35; *accord State v. Alires*, 2019 UT App 206, ¶ 25, 455 P.3d 636.

b.      Prejudice

¶60    We therefore proceed to assess whether James has carried his burden of demonstrating that Counsel's performance prejudiced him on Count 3. With regard to that charge, while Ashley did not differentiate between individual shower incidents or between individual bath incidents, she *did* generally differentiate the shower incidents from the bath incidents, and she offered specific facts—some of which were inconsistent—regarding the way each set of incidents unfolded.

¶61    During both her CJC interview and her trial testimony, Ashley described abuse in the shower and in the bath. Regarding both sets of acts, Ashley said that James claimed he was trying to "save water," a motivation that manifested itself by James joining Ashley in the shower and by James allowing Ashley to put only a little bit of water in the bathtub during baths. And regarding both

sets of acts, Ashley never claimed that James had an erection or that he touched her "private" parts. But in other respects, her testimony offered specific differences between the sets of acts. At trial, Ashley described a specific way in which James touched her during showers: she said that James would "sometimes" join her in the shower and that he would "stand super close to [her] and hug [her] while [they] were in the shower," and that he would sometimes "wash her hair and scrub her back with a luffa." But during that same trial testimony, Ashley did not describe any touching at all during the bath incidents; instead, she said that James would just sit on the toilet and watch her "roll around to get all wet" while trying to bathe in the small amount of water James afforded her.

¶62 She described the events somewhat differently during her CJC interview, parts of which came in during Interviewer's testimony and parts of which were read to the jury during the State's closing argument.[4] During the CJC interview, she indicated that James did touch her during the bath incidents, stating that if she couldn't finish washing herself in the bath due to the lack of water, James would "have to do it for [her]" and would "wash [her] body for [her]," sometimes using "a luffa."

¶63 Because the State did not charge the shower and bath incidents separately but instead combined them all into one count, we cannot resolve James's jury unanimity claim regarding Count 3 in the same way we resolved his similar claim regarding Counts 1

---

4. James makes no argument challenging the prosecutor's introduction, during closing argument and after both sides had rested, of parts of the CJC transcript that had not been presented or discussed during the parties' evidentiary presentations. That is, he does not assert that the trial court erred by allowing the prosecutor to do this, and he does not assert that Counsel performed deficiently by failing to object to the State's efforts. We therefore do not consider whether the prosecutor's introduction of these parts of the CJC transcript during closing was proper.

and 2. On this record, there was a reasonable evidentiary basis for the jury to potentially conclude that the shower incidents Ashley described constituted sexual abuse but that the bath incidents did not, or vice versa. Jurors could have reasonably concluded, based on the factual differences between the two sets of acts and on the inconsistencies in Ashley's description of them, that the shower acts occurred but that the bath acts did not, or vice versa. And given the differences in Ashley's description of the two sets of acts, jurors could have also reasonably concluded that James had criminal intent (e.g., to arouse or gratify his sexual desire) with regard to one set of acts but not the other. Indeed, as in *Jimenez*, we think it "appears entirely possible for jurors to have believed that [James] abused [Ashley] under some of the described circumstances but not others," *see* 2025 UT App 76, ¶ 62, and that, therefore, the conviction in this case could well have been the result of some jurors believing James was guilty on Count 3 because he abused Ashley in the shower but not in the bath, with others believing James was guilty on Count 3 because he abused Ashley in the bath but not in the shower. Accordingly, we are unable to say that there is not a reasonable probability of a different result regarding Count 3 in a hypothetical trial in which the jury was given a more specific unanimity instruction.

¶64    The State resists this conclusion by positing that, given Ashley's trial testimony (which did not specify any actual touching during the bath incidents), only the shower incidents could legally satisfy the elements of the charged offense, which require that at least some touching occur. *See* Utah Code § 76-5-404.1(2), (4)(h) (2021).[5] But the State overlooks the CJC interview transcript excerpts that the prosecutor read to the jury during his closing argument,

---

5. This statute was amended and renumbered after the events involving James occurred. *Compare* Utah Code § 76-5-404.3, *with id.* § 76-5-404.1 (2021). We cite the previous version of the statute in the text because it was the version in effect at the time of the events giving rise to the charges filed in this case.

which *do* indicate that James touched Ashley in the bathtub when he washed her after she was unable to complete the task herself due to the lack of water. The prosecutor's recitation of these excerpts reached the jury's ears without objection, and the CJC transcript ended up (mistakenly) going back with the jury during deliberations. Thus, correctly or not, the jury heard evidence that James touched Ashley during the bath incidents, and on this basis the State's argument fails.

¶65 Accordingly, with regard to Count 3, James has carried his burden of demonstrating that he was prejudiced by Counsel's deficient performance in not seeking a more specific jury unanimity instruction akin to MUJI 2d CR432. James has therefore demonstrated that, with regard to Count 3, Counsel rendered constitutionally ineffective assistance, and on this basis, we reverse James's conviction on that count.

## II. Rule 23B Motion

¶66 In addition to the claims he raises based on the appellate record, James asks us to consider his motion, filed pursuant to rule 23B of the Utah Rules of Appellate Procedure, in which he seeks an order remanding this case to the trial court for supplementation of the record regarding additional claims of ineffective assistance of counsel. Our supreme court has noted that where "the record is silent regarding counsel's conduct," a defendant may not be able to meet the burden of "pointing to specific instances in the record demonstrating both counsel's deficient performance and the prejudice it caused." *State v. Griffin*, 2015 UT 18, ¶ 16, 441 P.3d 1166. Rule 23B was "specifically designed" to remedy this problem. *Id.* ¶ 17 (cleaned up). Under that rule, a defendant "may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a).

¶67 To obtain a remand order under rule 23B, a movant must make a four-part showing. First, the motion "must be supported by

affidavits setting forth facts that are not contained in the existing record." *State v. Norton*, 2015 UT App 263, ¶ 6, 361 P.3d 719 (cleaned up). Second, those affidavits must contain "allegations of fact that are not speculative." *Id.* (cleaned up). Third, the allegations contained in the affidavits "must show deficient performance by counsel." *Id.* (cleaned up). And finally, the affidavits "must also allege facts that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.* (cleaned up). Importantly, the third and fourth elements require the defendant to "present the court with the evidence he [or she] intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v. Mason*, 2024 UT App 171, ¶ 63, 562 P.3d 1158 (cleaned up), *cert. denied*, 570 P.3d 658 (Utah 2025). "[I]f the defendant could not meet the test for ineffective assistance of counsel, even if his [or her] new factual allegations were true, there is no reason to remand the case, and we should deny the motion." *Griffin*, 2015 UT 18, ¶ 20.

¶68   James asserts that remand under rule 23B is necessary to supplement the record to support seven additional claims of ineffective assistance. First, he argues that Counsel provided ineffective assistance by seeking the admission of Ashley's CJC interview transcript because it ended up going back with the jury during deliberations. Second, he takes issue with Counsel's choice of defense strategy, accusing Counsel of choosing the manufactured memory defense against James's wishes and before investigating the case. Third, James believes Counsel rendered ineffective assistance in the manner in which Counsel addressed (or failed to address) certain inconsistencies in the timeline of events put forward by Ashley and Mother. Fourth, he claims that Counsel provided ineffective assistance in not calling a "qualified expert" to opine about the DARE program. Fifth, James argues that Counsel provided ineffective assistance by not presenting evidence of alternative reasons why Ashley moved out of James's house and how she continued to spend time there after the abuse. Sixth, he asserts that Counsel rendered ineffective assistance in the manner in

which he handled Uncle's testimony. And finally, James claims that Counsel rendered ineffective assistance when he failed to prepare James for the interview related to his presentence investigation report. We examine each of these claims in turn.

¶69 With his rule 23B motion, James submitted eight affidavits. Those affidavits were submitted by the following: (1) James himself, (2) Stepmother, (3) a neighbor (Neighbor), (4) Neighbor's daughter, (5) James's mother, (6) a juror, (7) another juror, and (8) a private investigator (Investigator). We summarize the proffered evidence below, as relevant to our discussion of each issue.

A. The CJC Transcript Going to the Jury

¶70 First, James asserts that Counsel's ineffectiveness led to the CJC transcript being sent back with the jury during deliberations. But this claim fails because—while, as discussed above in Part I.A, Counsel certainly sought admission of the CJC transcript for use during trial—Counsel did not agree that the transcript should go back with the jury during deliberations. Indeed, when the court asked whether the transcript would be sent back with the jury, Counsel responded, "No." And the State agreed, stating, "No, . . . [t]he rules are quite clear, the CJC video or the CJC transcript cannot go back with the jury for deliberations." And based on the agreement between the attorneys, the court gave specific orders that the CJC transcript was not to go back with the jury.

¶71 For reasons apparently related to an error by the court or by court staff, the CJC transcript did in fact end up going back with the jury during deliberations. But there is no indication—either in the record or in the affidavits James has submitted in connection with his rule 23B motion—that Counsel had anything to do with that unfortunate circumstance. Thus, even assuming that the matters in James's rule 23B affidavits are true, James has not carried his burden of demonstrating that Counsel performed deficiently in connection with the CJC transcript ending up in the jury room.

### B.       Running a Manufactured-Memory Defense

¶72    Second, James argues that Counsel rendered ineffective assistance by choosing a particular defense strategy before investigating the case and in opposition to James's wishes. As noted, Counsel chose to run a defense centered around the assertion that Ashley was not necessarily lying but had manufactured her memories of the abuse-related events she described on the witness stand. In this instance, James has not borne his burden of demonstrating that this choice was unreasonable.

¶73    As a general matter, "[t]he choice of which primary defense theory to advance is a strategic decision that will not often be second-guessed on appeal." *State v. Wilson*, 2020 UT App 30, ¶ 41, 461 P.3d 1124. As already noted, *see supra* ¶ 39, an attorney's reasonably informed strategic choices are almost unassailable in a deficient performance inquiry. Indeed,

> when considering a choice-of-strategy claim . . . , the relevant question is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. Rather, the question is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial. In making this assessment, an appellate court must recognize that the calculations of counsel in weighing the pros and cons of one strategy over another are, in essence, a judgment about what is most likely to work to the client's benefit in a complex trial process that requires that many choices be made. In such cases, so long as counsel could have reasonably chosen the strategy in question, and so long as the strategy is itself reasonable, the claim must fail.

*State v. Florreich*, 2024 UT App 9, ¶ 59, 543 P.3d 795 (cleaned up).

¶74 James acknowledges this caselaw, but he asserts that Counsel's decision to run a manufactured-memory defense was unreasonable. In particular, he asserts that Counsel did not properly investigate the case before selecting the defense and that Counsel made his choice against James's own wishes. As he now tells it, James offered his view to Counsel that Ashley "knows that she is not being truthful" and he urged Counsel to run a defense along those lines instead of the manufactured-memory defense.

¶75 It is of course true that an attorney "has a duty to adequately investigate the underlying facts of a case in order to formulate the basis for an acceptable trial strategy." *State v. Graham*, 2013 UT App 72, ¶ 15, 299 P.3d 644. But it is also true that "counsel is not obligated to view or interpret those underlying facts exactly as his client does when devising a trial strategy." *Id.* And on the record before us— including the rule 23B affidavits—James has not carried his burden of demonstrating that Counsel's choice was unreasonable.

¶76 In order to prevail on this choice-of-strategy claim, "it's not enough for [James] to just show that the approach Counsel took was problematic. [He] also needs to show that Counsel should have done something else instead." *Florreich*, 2024 UT App 9, ¶ 65. And the only alternative option James now offers is that—instead of arguing that Ashley's memories were manufactured—Counsel should have argued to the jury that Ashley was purposely lying. But James doesn't support this suggested defense with any concrete evidence—for instance, a recantation or an affidavit from an eyewitness who is willing to give a contradictory account of events—that Ashley was lying. And in the absence of any such evidence, we agree with the State that "painting a child victim as a liar—particularly in a sexual abuse case—can backfire at trial" and that this is a "risk that experienced trial counsel would recognize, but a lay defendant might not." Counsel instead chose a strategy that called into question Ashley's memories without accusing her of lying, and this approach allowed Counsel to humanize Ashley

without conceding guilt. On this record, we cannot say that Counsel's choice was unreasonable.

¶77    And we are unpersuaded by James's assertion that Counsel selected this strategy before adequately investigating the facts of the case. As the State points out, James "offers no evidence of what Counsel's investigation actually entailed," and he instead makes a series of unsupported assumptions about the scope of Counsel's investigation and about the timing of Counsel's choice of strategy. Counsel chose a defense that was supported by at least some evidence, as well as by Expert. To be sure, Expert took some hits on cross-examination, particularly about his earlier license suspension. But the fact that a chosen defense does not succeed is not necessarily an indication that its choice was unreasonable. *See State v. Green*, 2023 UT 10, ¶ 108, 532 P.3d 930 ("As we have repeatedly stated, simply because a lawyer's legitimate exercise of judgment in the choice of trial strategy or tactics does not produce the anticipated result, does not mean that counsel was ineffective." (cleaned up)).

¶78    For all of these reasons, we reject James's assertion that Counsel performed deficiently by choosing to run a manufactured-memory defense at trial.

C.    Timeline-Based Impeachment

¶79    Third, James takes issue with the manner and extent to which Counsel chose to address various timeline-based inconsistencies in both Ashley's and Mother's accounts of events. He does not contend that Counsel entirely ignored timeline-based inconsistencies; indeed, he acknowledges that Counsel did—at least to some extent—explore these issues through evidentiary presentation and cross-examination. But he asserts that Counsel should have done more and dug deeper, and he asserts that Counsel's failure to do so constituted ineffective assistance. We disagree.

¶80    In his motion, James points to—among other things—the inconsistencies in Mother's testimony about when Ashley claimed

the abuse began. Investigator found that Mother had originally reported that Ashley had told her the abuse had "happened for as long as she could remember until she reached the fifth grade" and that Mother had said Ashley told her that the abuse stopped in the fifth grade when Ashley went through a sex education class. Some of this information was inconsistent with Ashley's later statements, made during her CJC interview and during her trial testimony, in which she stated that the abuse stopped in *sixth* grade (rather than fifth) when she learned about sexual assault in the DARE program.

¶81    But Counsel did address the main inconsistency identified here: the question of when Mother and Ashley claimed that the abuse started and stopped. In particular, Counsel addressed Mother's main misstatement (fifth grade versus sixth grade) of the timeline. During her trial testimony, Mother acknowledged that the statement she gave to police during the investigation incorrectly indicated that the abuse stopped when Ashley was in fifth grade. Mother explained that the reason for her mix-up was because she had confused the "maturation clinic" that Ashley had in fifth grade with the DARE program that Ashley had in sixth grade. James takes issue with Counsel's choice not to further question Mother on this same issue by asking her about other instances in which she made similar erroneous statements about the abuse having ended in fifth grade. But choosing not to ask additional questions about a point already made is not necessarily an unreasonable choice, especially given that Counsel did reemphasize the point during closing argument, telling the jury that Mother's story had "changed [to] between 10 and 12" from "as long as she could remember until she reached fifth grade," and that the jury should disbelieve Mother's testimony on that basis.

¶82    In our view, the way in which Counsel chose to address the inconsistencies in Mother's and Ashley's accounts about when the abuse occurred was not unreasonable. On this basis, we conclude that James has not demonstrated that Counsel performed deficiently in this respect. Although further questioning "might have bolstered

[Counsel's] argument to some small degree, we are unpersuaded that there was no reasonable basis for [C]ounsel's decision to [forgo] additional focus on this theory." *State v. Arriaga*, 2012 UT App 295, ¶ 22, 288 P.3d 588.

D.    DARE Expert

¶83    Fourth, James asserts that Counsel rendered ineffective assistance by not calling "a qualified expert" to testify that sexual abuse is not typically included in the DARE curriculum.

¶84    James supports this claim with Investigator's affidavit. In that affidavit, Investigator described an interview she conducted with a school resource officer who had "been involved with the DARE program since the early 90's." During this interview, the officer stated that he was "never . . . taught to teach as part of the DARE curriculum" "anything about any kind of sexual abuse or inappropriate touching," and that "sexual abuse was not part of the curriculum in any [junior high or elementary school] curriculum that [he] ever saw." He also described the DARE program as very "curriculum based" and stated that he was taught to "stay on topic and stay on curriculum."

¶85    But the officer that Investigator interviewed does not purport to be the same individual who taught the DARE class at Ashley's school during her sixth-grade year. Thus, while this officer apparently has general knowledge about what the DARE program is typically designed to include, he does not purport to know what was actually taught to Ashley's group during the class in question.

¶86    And general information about the DARE program was already introduced at trial, through Interviewer's testimony. During Counsel's cross-examination of Interviewer, he asked her whether she was "aware that the DARE program really talks about drugs and police and . . . safety, that kind of thing" and "not sexual abuse," and Interviewer responded in the affirmative. Thus, Counsel made sure—through the testimony of a person who was in a position to

know—that the jury was aware that the DARE curriculum did not typically include any discussion of sexual abuse.

¶87 "Whether to choose one particular expert over another is a quintessential strategic decision that we are loath to second-guess with the benefit of hindsight." *State v. Hamberlin*, 2025 UT App 131, ¶ 37, 577 P.3d 912; *see also State v. Houston*, 2015 UT 40, ¶ 90, 353 P.3d 55 (categorizing as a "tactical decision[]" the choice to "call[] and retain[]" a particular expert witness (cleaned up)). In this case, the choice Counsel made—to introduce evidence about the DARE curriculum through Interviewer rather than a different expert—was not unreasonable. *See Hamberlin*, 2025 UT App 131, ¶ 39 ("Counsel had vigorously cross-examined [the witness] and likely reached the reasonable conclusion that he had made the points he needed to make, thus reducing the need for an additional expert.").

¶88 Accordingly, James has not shown that Counsel performed deficiently by choosing not to call an additional "qualified expert" to testify about the general contents of the DARE curriculum.

E.     The Reasons for Ashley Moving Out

¶89 Fifth, James claims that Counsel was ineffective for not presenting additional evidence regarding the reasons Ashley moved out of his house, as well as evidence that—even after moving out and after disclosing that James had abused her—Ashley continued to spend time with James.

¶90 James supports this claim with various affidavits, including affidavits from himself, Stepmother, Neighbor, and Neighbor's daughter. In those affidavits, the witnesses assert that Ashley left James's house and went to live with Mother not because he had abused her but, instead, because Ashley did not like the woman James started dating after his breakup with Stepmother. They further assert that Ashley especially did not like the woman's son, whom she apparently "hated babysitting." And in his affidavit, James asserts that during the same time frame, he took away

Ashley's phone as a disciplinary measure, which he claims "became a huge point of contention" between them and caused their relationship to deteriorate. Furthermore, some of the affiants aver that Ashley continued to spend time with James even after she disclosed the abuse and moved in with Mother, specifically noting that she watched her younger sister at James's house, attended her younger sister's birthday party with James present, and went trick-or-treating with James and her younger sister on Halloween.

¶91　James contends that this evidence—which was largely not introduced at trial—would have been helpful to James and would have cast doubt on Ashley's claims that James had abused her. We acknowledge James's point, and for purposes of our analysis we will assume—without deciding—that Counsel's failure to present this evidence constituted deficient performance.

¶92　But even so, James's assertion of ineffective assistance fails on prejudice grounds. Again, in assessing prejudice, we must "consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86. In such an alternative universe, the jury would have heard the evidence explained above—that Ashley disliked James's new girlfriend and her son, that James's acts of discipline angered her, and that she continued to spend time with James after she moved out. While this evidence would have certainly been somewhat helpful to James, we do not see it as such a difference-maker as to create a reasonable likelihood of a different result in a hypothetical trial in which the jury heard this evidence. As the State points out, Ashley's continued contact with James after her disclosure is "not inherently inconsistent with her testimony" that James abused her and that the abuse stopped in sixth grade. And the evidence about the discipline and about Ashley's apparent antipathy toward the new girlfriend would have certainly added some helpful context for James, but offering the jury this alternative explanation for one detail in the overall story is not reasonably likely to have changed the outcome. The jury had heard Ashley's testimony about the abuse and had also

already heard extensive impeachment evidence about timeline inconsistencies and about manufactured memory.

¶93 For these reasons, even adding James's new affidavits to the equation, we are unpersuaded that James has demonstrated a reasonable likelihood of a different outcome. On this basis, James has failed to show prejudice for this claim.[6]

F. Uncle's Testimony

¶94 Sixth, James asserts that Counsel rendered ineffective assistance in the manner in which he handled Uncle's testimony during and after the State's cross-examination. In particular, he takes issue with Counsel's failure to object when the State utilized undisclosed evidence to impeach Uncle and with Counsel's decision not to "request appropriate relief" under the circumstances.

¶95 Uncle testified as a defense witness at trial. During its cross-examination of Uncle, the State played a previously undisclosed

---

6. James does not expressly make a cumulative prejudice argument. But in our view, not even the cumulative prejudice of the jury unanimity issue and this issue combined would be enough to result in a reasonable probability of a different result regarding Counts 1 and 2. As an initial matter, the two issues—the lack of a more fulsome jury unanimity instruction and the lack of additional impeachment evidence about the reasons for Ashley's departure from James's house—are analytically separate and do not lend themselves particularly well to cumulative prejudice. The one issue has to do with whether the jury could have differentiated the various acts Ashley described on Counts 1 and 2, and the other has to do with whether Ashley's account is believable and consistent. But more substantively, we simply do not think that there is a reasonable probability of a different outcome on Counts 1 and 2 in a counterfactual trial in which the jury both (a) got a better jury unanimity instruction and (b) heard more about the reasons why Ashley left James's house and that she continued to see him.

recording of a phone call that a prosecutor had conducted with Uncle before trial. Specifically, the State presented evidence that Uncle, during that call, stated that he "kind of thought that [James] did it." Uncle attempted to explain away his comment by stating, "Because of the fact that we weren't talking. I guess what I was trying to say was I never thought he did it. What I wanted to say was I was fighting with him, so it was his deal, you know, whatever, whatever." At that point, even though Counsel hadn't heard the recording before, he did not object to the State's use of the recording, nor did he ask for a break or a continuance to listen to the complete recording. Instead, he asked that a longer excerpt of the call be played for the jury.

¶96    During the longer excerpt, Uncle stated that James had "been nothing but a great dad" to Ashley, that Ashley "hated to go back" with Mother, and that "she loved being with" James. And on redirect, Counsel asked Uncle to clarify the comments referenced by the State, and Uncle responded, "[W]hen [the prosecutor] was talking to me about that, what I was getting at was that, you know, I didn't care what happened to [James] at this point because we were not really talking. Then we reconciled after that, and I think I said on that tape that, you know, that was basically why I said that. That wasn't that I actually thought that he'd ever done it."

¶97    In his rule 23B affidavits, James presents evidence that the recording of the phone call contains an additional statement not played for the jury, namely, that Uncle said this: "And I know he's not into that. I know he would never do that to his kid. Never. That's how I feel."

¶98    James takes issue with the manner in which Counsel handled Uncle's testimony. In particular, James criticizes Counsel for not playing more of the recording—including the part quoted immediately above—and for not objecting to the State's use of the recording or, at a minimum, asking for some sort of continuance so that he could review the entire recording.

¶99 But in our view, the way in which Counsel decided to handle Uncle's testimony was not unreasonable. James does not contend that Counsel, by objecting, could have somehow prevented the State from using the recording for impeachment purposes. Counsel did have the right to listen to the whole recording, *see* Utah R. Evid. 613, and James takes issue with Counsel's failure to do so in advance. But Counsel reasonably addressed the negative testimony offered by Uncle during cross-examination: he played more of the recording, and he asked Uncle to clarify things on redirect. And in that clarification, Uncle testified that he didn't actually think James had "done it." Counsel's choice to not play more of the recording—which would only have served to reiterate the point Uncle made on redirect—was therefore not unreasonable.

¶100 Thus, James has not demonstrated that Counsel performed deficiently with regard to Uncle's testimony.

G.     Presentence Investigation Preparation

¶101 Finally, James asserts that Counsel rendered ineffective assistance by not adequately preparing him for the interview related to his presentence investigation report. James supports this claim with his own affidavit, in which he avers that Counsel "did not prepare [him] for the" interview. He claims that, because he was unprepared, he "did not know what was going on" and so he "unloaded on the interviewer" by expressing all his "anger and confusion." James acknowledges that, even with preparation for the interview, he "would have and continue[s] to maintain [his] innocence," but he asserts that if he "had known what was going on" he "would have handled [the interview] differently."

¶102 For purposes of this discussion, we will assume—again without deciding—that Counsel performed deficiently by taking no action to prepare James for his presentence investigation interview. But even given this assumption, James has failed to show that he was prejudiced by any such deficient performance.

¶103  As noted, the court at the conclusion of the sentencing hearing sentenced James to fifteen years to life in prison on all three counts, but it ordered that the sentences run concurrently. James asserts that, had he been adequately prepared for his interview, the outcome of his sentencing would have been different. But the court's sentencing decision did not turn on James's rudeness to the presentence interviewer.

¶104  It is true that, at sentencing, the State emphasized the probation officer's comment that James's "behavior was disrespectful and unwarranted" and that he "ha[d] a poor attitude towards the present offenses." The State also mentioned James's comment to the interviewer that the "whole thing was a fucking joke." But it did so in the broader context of emphasizing that James had failed to accept responsibility for his offenses, and by then arguing that the court should impose "consecutive sentence[s]."

¶105  As it turned out, the court did not end up imposing consecutive sentences; instead, it ordered that James's sentences run concurrently to each other. Moreover, James's profane comments to the interviewer aside, James acknowledges—even in his rule 23B affidavit—that he never intended to accept responsibility for his offenses and that he wouldn't have done so even if he had been adequately prepared for his interview. In context, we agree with the State's assertion that "the root of James's problem was not a lack of preparation, but his refusal to accept responsibility."

¶106  For these reasons, in a counterfactual world in which James had been adequately prepared for his presentence interview, we see no reasonable likelihood of a different outcome at sentencing. Thus, James has failed to demonstrate that he was prejudiced by Counsel's failure to adequately prepare him for the interview.[7]

---

7. It is not necessary to engage in a cumulative prejudice analysis with regard to this issue, as we did with the other two, *see supra* note

(continued…)

CONCLUSION

¶107 James raises ten different claims of ineffective assistance, three based on the existing record and seven more in connection with his rule 23B motion. With regard to James's assertion that Counsel rendered ineffective assistance regarding Count 3 by not requesting a more specific jury unanimity instruction, we find merit in James's claim; we therefore reverse James's conviction on Count 3 and remand this case to the trial court for further proceedings regarding that count. In all other respects, we reject James's claims of ineffective assistance, and we therefore deny James's rule 23B motion and affirm his convictions and sentence on Counts 1 and 2.

_____

6, because this claim has to do with the outcome of the *sentencing* rather than the outcome of the *trial*. Where there is only one item that is potentially prejudicial, a cumulative prejudice analysis is not required. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 48, 428 P.3d 1038 (stating that "a single accumulable error cannot warrant reversal under the cumulative error doctrine").